Whitaker, Judge,
delivered the opinion of the court:
In our previous opinion in this case (148 Ct. Cl. 507; 180 F. Supp. 412, cert. denied, 363 U.S. 829), we held plaintiff’s patent was valid and had been infringed by defendant. The case is now before us on the amount of the recovery.
It has been extremely difficult for the parties to ascertain the facts necessary to determine the amount to which plaintiff is entitled. Plaintiff made calls on the respective departments and they answered as best they could, but they were unable to supply us with the data necessary for an accurate determination. The Air Force stated that they could give the price paid for an entire airplane, but not an accurate one for the canopy alone, since they did not require the contractors, from whom the planes were purchased, to give them a breakdown into their various elements. After receipt of our call upon them, the Navy secured estimated cost figures of the canopies from the contractors’ computation of the cost of the different parts.
Plaintiff’s computations are based on an analysis by a Professor Koppen of the various components of each infringing structure and a computation of the theoretical cost per canopy. We do not regard this as reliable.
One piece of evidence does give definite figures. Plaintiff located and introduced in evidence a United States Air Force stock list, which gave standard prices for parts of the North American F-86 aircraft, which includes the cost of canopies. This shows that one type of canopy assembly cost $14,261, another $9,433, and a third, $994.
It is well known that there have been great improvements and refinements in airplanes since World War II ended in 1945. Today, by the pressing of a button or by the pulling of a lever, the canopy flies open and is blown away, and the pilot and the seat on which he sits are automatically ejected from a plane. The Trial Commissioner correctly finds, to which no exception was filed:
It appears reasonable that the highest cost per canopy listed covers installation of an entire canopy assembly including motors, hydraulic control systems, and perhaps explosive jettisoning devices.
A patentee, of course, is only entitled to recover for the value *225 of bis invention, not for non-infringing improvements therein.[1] Saulnier’s device was a simple one. It ¡consisted of a canopy that slid back and forth on rollers that moved in a track. When the pilot found it necessary to jump out, he rose from his seat and pulled a cord at the top of the canopy which released it from the rollers. Then the pilot gave the canopy a push upward to let the air get under it, which blew it away, and the pilot then jumped out. There were no motors, hydraulic control system, explosive device, or the like.
The cheapest canopy assembly in the United States Air Force stock list, mentioned above, was, no doubt, as good as Saulnier’s. The stock list described it as “Canopy, assy-ckpt encl compl”, which means, canopy, assembly-cockpit, enclosed, complete. It is not stated that this includes the device for sliding it back and forth, when desired, and for releasing it and letting the wind blow it away, when this was desired; but this was standard equipment, and, so, if it was “complete”, it must have included it. By introducing it in evidence, plaintiff impliedly vouches for the fact that it did include it. This canopy assembly cost $994.
The Trial Commissioner has set out in his findings Table A, which lists the price of the various canopies as contended for by defendant and by plaintiff. The parties take only minor exceptions to the figures contained in this table. ' The table show's the total number of canopies purchased by defendant, in which plaintiff’s invention was used, as 12,965. However, there is not included 56 McDonald F3H-1N canopies purchased from 1954-1955. It does include 400 McDonald F2H-3-4 canopies, but the Trial Commissioner finds that there was no proof that these canopies contained the infringing device. However, he has included them in the total, on the assumption that this device was used in all canopies. Since the whole table includes estimates and approximations, we think it was not improper to include these 400 canopies in the number purchased. We adopt the Trial Commissioner’s figures on the number of airplanes pur *226 chased, with the addition of the 56 McDonald F3H-1N, a total of 13,021.
Defendant’s figures on the cost of canopies run from $13,500 down to $719 and three of them as low as $475. The Commissioner arrives at an average cost, according to defendant’s figures, of $2,529 per canopy assembly. The average of plaintiff’s figures is $6,282. We do not think it is proper to adopt either of these figures, because, of necessity, they are weighted by expensive improvements over plaintiff’s simple device, or by added facilities. As we have stated, the United States Air Force stock list introduced by plaintiff lists a canopy assembly at $994, which we must assume utilized plaintiff’s device. Any canopy assembly that cost more than this must have contained improvements or added facilities, miconnected with plaintiff’s invention, and upon which he is not entitled to a royalty.
The British Government, in settling plaintiff’s claim against it for patent infringement, adopted an average figure of $413 per canopy. Mr. Guerbilsky was then, and at the trial of this case before Trial Commissioner Lane, the French attorney for plaintiff, and as such handled for plaintiff the negotiations with Great Britain for a settlement of his claim of infringement by this government. He testified that plaintiff and the British Government agreed on prices ranging from 87 pounds, 10 shillings and 4 pence to 130 pounds, the equivalent of $332.50 to $494. This averages $413 per canopy. If we allow for intervening monetary fluctuations, we have a figure of between $500 and $600.
Of course, the best guide for the determination of just compensation are the royalties agreed upon between the patentee and licensees in arm-length transactions. Unfortunately, there are no commercial licensees in this case, but the settlement between plaintiff and the British Government does establish a guide. This was negotiated after the war was over. Great Britain was a government foreign to plaintiff, who was a Frenchman. Negotiations lasted over a period of 18 months. A price was agreed upon of $14 per plane for from 26,000 to 27,000 planes, a total consideration of 99,090 British pounds. At the then rate of exchange, this amounts to $376,542.
*227 Concerning this settlement, Mr. Guerbilsky said, * * We achieved very satisfactory results for both sides.” (Tr. 502.)
Under the Byrnes-Blum Agreement the French Government assumed this country’s liability to French citizens for patent infringement during World War II. Plaintiff presented to it a claim for infringement by the United States, and settled its claim for the period December 18, 1941 to September 2, 1945 at $4 a canopy for 127,500 canopies. This compares with $14 a canopy agreed upon with the British Government.
We can only indulge in speculation as to the reason for plaintiff’s settlement with his own government at a figure so much lower than that he secured from Great Britain, but, be that as it may, the settlement with Great Britain being an arm’s-length transaction, is much the better guide. If we adjust this settlement for the difference in the economy then and now, we have a figure of about $18 per canopy, or a total amount of $237,996.
Had the parties entered into negotiations for a license to use plaintiff’s invention on the basis of 13,000 planes, the canopies on which were expected to cost, say $1,000 per canopy, or a total cost of about $13 million, we think the parties might well have agreed upon a royalty at the approximate rate of 3 percent on the first $5 million (instead of the first $1 million recommended by the Trial Commissioner, influenced by our decision in Badowshi v. United States, 150 Ct. Cl. 482, 278 F. 2d 934), and 2 percent on the excess. At $1,000 per canopy[2] this would amount to $310,000. This is to be compared with the royalty agreed upon in the British settlement, adjusted for monetary fluctuations, which amounts to $237,996.
We are obliged to enter a judgment somewhat in the nature of a jury verdict. Taking all the foregoing into consideration, we think the compensation, which is just to both parties, amounts to the sum of $250,000.
We do not know the date of defendant’s purchases, nor the rate of them in the seven years between December 9, 1948 *228 and August 2, 1955. Taking an intermediate date of 3y2 years, and allowing 4 percent per annum for delay in payment, plaintiff is entitled to recover an additional sum of $110,000 for delay in payment.
Judgment will be entered in plaintiff’s favor for the sum of $360,000.
Davis, Judge, did not participate in the consideration and decision of this case.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Donald E. Lane, and the briefs and argument of counsel, makes findings of fact as follows:
45. On January 20, 1960, the court held that Saulnier patent 2,125,752 was valid and had been infringed, and that plaintiff is entitled to recover. 148 Ct. Cl. 507, 180 F. Supp. 412. On June 20, 1960, defendant’s petition for certiorari was denied by the Supreme Court of the United States, 363 U.S. 829. An accounting trial has been held in order to determine the amount of reasonable and entire compensation due plaintiff under Title 28 U.S.C., § 1498.
46. On October 31, 1960, plaintiff filed a new petition, case No. 418-60, alleging infringement of patent 2,125,752 by defendant during the period from December 9, 1954, the filing date of the petition in case 471-54, to August 2,1955, the expiration date of said patent. The parties have stipulated that the present accounting in case No. 471-54 shall be extended to cover defendant’s unauthorized use of plaintiff’s invention during the additional 8-month period. The total recovery period is thus December 9, 1948 through August 2, 1955.
47. Plaintiff charges infringement of certain claims of the '752 Saulnier patent by the cockpit canopy assemblies used on many types of defendant’s aircraft. The court previously found that these patent claims were infringed by the Douglas Sky Raider AD-6/7, the Grumman Fury FJ-2, the Northrup Scorpion F-89D, and the Republic Thunder-jet F-84 aircraft. The court’s opinion also noted that counsel agreed that plaintiff would have the right to present evidence during the accounting as to other aircraft cockpit *229 canopy assemblies. The aircraft now charged to infringe are listed in column 2 of the accompanying Table A. The types previously considered by the court are designated by an asterisk.
48. The Beech T-34B aircraft includes a canopy assembly having roof portions which are slidable on rollers in tracks, when in flight, by compressed air means operative from inside the canopy. The roof portions and tracks are also instantaneously detachable from the aircraft in an emergency by a release handle also within the canopy. The T-34B construction is described in plaintiff’s exhibit 25. Said construction includes the combination of elements recited in claims 1 and 6 of the '752 patent, produces the same results, and infringes said claims.
49. The Chance Vought F7U-1 aircraft includes a canopy assembly slidable on rollers in tracks, when in flight, by means of a hydraulic system controlled by an internal control lever, and the canopy may be thrown from the aircraft by operation of an internal emergency release handle. The F7U-1 construction is described in plaintiff’s exhibit 27. Said construction includes the combination of elements recited in claims 1 and 6 of the '752 patent, produces the same results, and infringes said claims.
50. The Chance Vought F7U-3 aircraft includes a canopy assembly having a transparent section slidable on rollers in tracks during flight by a hydraulic system operated by a canopy control switch in the cockpit. The canopy section may be jettisoned by emergency air pressure controlled by an emergency canopy air valve in the cockpit. The F7U-3 construction is described in plaintiff’s exhibit 28 and includes the combination of elements recited in claims 1 and 6 of the '752 patent, produces the same results, and infringes said claims.
51. The Grumman F8F-2, F8F-2N, and F8F-2P aircraft include a transparent bubble canopy supported on three trucks which slide in tracks by means of a cable and crank mechanism operated from within the cockpit. The slidable canopy is locked to the supporting trucks 'by pin and latch devices. By operating an emergency release handle within the cockpit, the canopy is released from the trucks and *230 jettisoned. The F8F-2, F8F-2N, and F8F-2P constructions are described in plaintiff’s exhibit 29. Said constructions include the combinations of elements recited in claims 1, 2, 3, 6, and 7 of the '752 patent, produce the same results, and infringe said claims.

*231 52. The Grumman F9F-2 and F9F-3 aircraft include a transparent plastic canopy mounted for sliding movement on rollers and tracks by means of a hydraulic system controlled by a handle within the cockpit. The hydraulic control handle is located on the left cabin rail and is moved forward to close and aft to open the canopy. A lever mounted on this handle, held by a spring and lockwire, when forced down into the handle permits moving the handle to jettison the canopy. The F9F-2 construction is described in plaintiff’s exhibit 30A, and plaintiff’s exhibit 30B describes operation of the XF9F-3 cockpit enclosure controls in similar language. These constructions include the combinations of elements recited in claims 1 and 6 of the '752 patent, produce the same results, and infringe said claims.
53. The Grumman F9F-4, F9F-5, F9F-5P, F9F-6, F9F-6P, F9F-7, F9F-8, and F11F-1 aircraft include a transparent plastic bubble type canopy mounted on side and rear rollers and tracks for sliding movement effected by a hydraulic system controlled by a handle in the cockpit. A jettison lever is mounted on said handle to free the canopy from the aircraft. The actual constructions on these aircraft are described in plaintiff’s exhibits 31, 32, and 33, and include the combinations recited in claims 1 and 6 of the '752 patent, produce the same results, and infringe said claims.
54. The Lockheed F80-C aircraft includes a transparent sliding bubble type canopy controlled by electrical means within the cockpit. The canopy may be jettisoned by explosive means controlled from within the cockpit. The F80-G construction is described in plaintiff’s exhibits 17A and 17B and includes the combination of elements recited in claims 1 and 6 of the '752 patent, produces the same results, and infringes said claims.
55. The McDonnell F2H-1, F2H-2, F2H-2N, F2H2P, F3H-1N, and F3H-2N aircraft include canopies slidable on tranks, a chain and sprocket drive mechanism for sliding the canopies, and a motor operated by a switch in the cockpit for driving said mechanism. The constructions include an air motor for driving the canopy aft and off to jettison the canopy in response to a control in the cockpit. The construction of these McDonnell controls is described in plain *232 tiff’s exhibits 34, 35, 36, 37, and 38. Said constructions include tbe combination of elements recited in claims 1 and 6 of the '752 patent, operate to produce the same results, and infringe said claims.
56. The construction of the accused McDonnell F2H3-4 aircraft is not specifically illustrated or described in the evidence of record herein. No finding is made on whether or not the F2H3-4 aircraft infringe claims of the '752 patent. The McDonnell F2H3-4 aircraft may be similar to the McDonnell F2H-1, -2, -2N, and -2P series or the McDonnell F3H-1N or -2N series discussed above but apparently evidence to so prove was not available to plaintiff.
57. The North American F-82E aircraft includes a sliding canopy on each of its two fuselages, each canopy being mounted on trucks which operate in tracks, and each canopy being controlled by a crank assembly in the cockpit operating a chain and cable mechanism to slide and position the canopy. Each canopy may be jettisoned by operation of a handle in the cockpit which acts to release the canopy from the trucks in any position, and the canopy goes upward and off the aircraft. The F-82E construction is described in plaintiff’s exhibits 18A, 18B, and 18C. Said construction includes the combinations of elements recited in claims 1, 2, 3, 6, and 7 of the '752 patent, produces the same results, and infringes said claims.
58. The North American F-82F, F-82G, and F-82H aircraft are also 2-fuselage planes including slidable canopies similar to those on the F-82E and jettisonable from any position. The F-82F, F-82G, and F-82H constructions are described in plaintiff’s exhibits 19A and 19B, include the combinations of elements recited in claims 1, 2, 3, 6, and 7 of the '752 patent, produce the same results, and infringe said claims.
59. The North American F-86A, F-86E, and F-86F aircraft include transparent canopies which are slidable on tracks attached to the fuselage by means of a rack and motor which is controlled from within the cockpit. The canopies are jettisonable by explosive devices which disconnect a rear hook and cause the canopy to run off from its tracks. The F-86A, F-86E, and F-86F constructions are described in *233 plaintiff’s exhibits 20-A, 20-B, 21-A, 21-B, 22-A, and 22-B, include the combination recited in claims 1 and 6 of the '752 patent, produce the same results, and infringe said claims.
60. The North American FJ-3 and FJ-4 aircraft include canopies slidable on tracks, an electrically driven jack-screw mechanism controlled by switches within the cockpit for sliding the canopies, and explosive means operated by pulling an emergency handle to the left of the instrument panel for jettisoning the canopy rear end first. The FJ-3 and FJ-4 constructions are described in plaintiff’s exhibits 39 and 40, include the combination of elements recited in claims 1 and 6 of the '752 patent, produce the same results, and infringe said claims.
61. The Northrup F-89A, F-89B, and F-89C aircraft include canopy constructions similar to those on the F-89D described in finding 37 of the court’s opinion dated January 20,1960. The F-89A, F-89B, and F-89C constructions are also described in plaintiff’s exhibits 23-A, 23-B, and 24. These constructions include the combination of elements recited in claims 1 and 6 of the '752 patent, produce the same results, and infringe said claims.
62. The Republic F-84D, F-84E, and F-84G aircraft presumably include slidable and jettisonable canopy assemblies like those used on the Republic Thunder jet F-84, described in finding 33 of the court’s opinion of January 20, 1960. Defendant has not objected to plaintiff’s request for a finding that there was infringement of the '752 patent by F-84D, F-84E, and F-84G type aircraft was found by the court to infringe in finding 34. Accordingly, it is found that these Republic aircraft constructions infringe one or more of the patent claims in suit.
63. The accompanying Table A includes the various types of aircraft found to have canopy assemblies which infringe claims of the Saulnier '752 patent. The data tabulated in columns 3 and 4 are based on information furnished by defendant’s agencies in response to calls. An Air Force response to call states that the Air Force did not require price breakdowns for each aircraft procured between 1945 and 1952. A Navy response to call states that some cost figures furnished were computed by contractors from the cost of *234 parts. There is a wide variation in the canopy costs reported and tabulated. The range extends from $475 for the AD-6 canopy to $13,850 for the F-89A canopy. It appears reasonable that the lowest cost per canopy listed covers only the cost of a transparent plexiglass roof panel without mountings or controls for sliding and jettisoning. It appears reasonable that the highest cost per canopy listed covers installation of an entire canopy assembly including motors, hydraulic control systems, and perhaps explosive jettisoning devices.
64. Plaintiff’s expert, Professor Otto C. Koppen, estimated the cost of each canopy assembly to defendant as listed in column 6 of Table A. These estimates were made by analyzing the various components of each infringing construction, considering the number of each type procured, and calculating a cost per canopy. Some of Professor Kop-pen’s estimates are the same as those furnished by defendant’s agencies, and other estimates are substantially greater.
65. A United States Air Force Stock List, plaintiff’s exhibit 48A — 48B, located by plaintiff, relates to standard prices for parts for the North American F86 aircraft. For “CANOPY: movable; p/o dwg no. 190-31801-3, enclosure installation, cockpit, complete, u/o dwg no. 207-31601, fuselage assy & installation, front,” the stock list indicaes a “standard price” in the amount of $14,261. For “CANOPY: movable; p/o dwg no. 190-31801-3, enclosure installation, u/o part no. 207-31601, fuselage assy, front,” the stock list indicates a standard price in the amount of $9,433. For “Canopy, assy-ckpt end compl” the stock list indicates a standard price in the amount of $994. Available evidence does not indicate exactly what structure is included in each of these items.
66. The information supplied by defendant’s agencies indicates that defendant procured approximately 12,965 infringing canopy assemblies during the period December 9, 1948 through August 2, 1955. This total does not include approximately 201 spare canopies procured during said period, nor does it include 56 McDonald F3H-1N canopies purchased from 1954-1955. There appears to be no satisfactory method by which plaintiff can verify defendant’s procurement totals.
*235 67. The total cost of the 12,965 canopy assemblies, based upon defendant’s cost estimates listed in column 4 of Table A, amounts to $32,794,226. Based upon the plaintiff’s cost estimates listed in column 6 of Table A, the total cost amounts to $81,447,866. These totals do not include the cost of spare canopies, nor the cost of the 56 McDonald canopies mentioned above. These totals give an average canopy assembly cost of $2,529 per canopy based on defendant’s estimates, and an average cost of $6,282 per canopy based on plaintiff’s estimates.
68. In this accounting, plaintiff contends that reasonable and entire compensation should include 15 percent of his estimated total cost for infringing canopy assemblies plus additional compensation at the rate of 6 percent to date of payment. Plaintiff also contends that the total cost should be based upon Professor Koppen’s cost estimates increased by 50 percent, on the ground that Professor Koppen underestimated. It is noted that plaintiff’s petition in case 418-60 alleges that the damage caused plaintiff by defendant’s infringement of the Saulnier '752 patent is an amount measured as 5 percent of the average cost of a slidable and jettisonable canopy with its accessories, multiplied by the number of such canopies procured as original equipment or as spares between December 9, 1954 and August 2, 1955.
69. Plaintiff’s estimate of a total cost of $81,447,866 multiplied by 15 percent gives a royalty amounting to $12,217,179.90.
70. Plaintiff’s estimate of a total cost of $81,447,866 increased by 50 percent (for alleged underestimating) and multiplied by 15 percent, gives a royalty amounting to $18,325,769.85.
71. Application of plaintiff’s 5 percent damage rate to plaintiff’s estimate of a total cost of $81,447,866 gives a royalty amounting to $4,072,393.30.
72. Application of plaintiff’s 15 percent rate to the total estimate of a cost of $32,794,226 (based on defendant’s responses to calls) gives a royalty amounting to $4,919,133.90.
73. Application of plaintiff’s 5 percent damage rate to the total estimate of a cost of $32,794,226 gives a royalty amounting to $1,639,711.30.
*236 74. In Badowski v. United States, 150 Ct. Cl. 482, 278 F. 2d 934, decided June 8, 1960, the court allowed reasonable and entire compensation for patent infringement at the rate of 3 percent of defendant’s costs on the first one million dollars and 2 percent of its costs in excess of that amount, with 4 percent per annum to date of payment to compensate plaintiff for the delay in payment. Application of this rate to the defendant’s estimated total cost of $32,794,226 gives a royalty in the amount of $665,884.52 plus 4 percent per an-num to date of payment.
75. The evidence indicates that about 1,100 aircraft embodying the cockpit roof construction illustrated and described in the Saulnier '752 patent were built in France between 1938 and 1948.
76. In this accounting, defendant contends that reasonable and entire compensation should be an amount somewhat less than $4 per canopy. Defendant also “reserves its right to request, at final hearing, a reconsideration of the validity of the Saulnier patent * * Defendant’s expert, Capt. Robert A. Lavender, U.S.N. (Ret.), concluded that $4 per canopy is a reasonable and liberal amount per canopy for defendant’s use of the Saulnier invention. Application of defendant’s $4 rate to the 12,965 infringing canopies procured by defendant gives a royalty amounting to $51,860 at a royalty rate of .158 of 1 percent on defendant’s estimate of canopy costs.
77. The $4 rate urged by defendant is the rate arrived at in friendly settlement negotiations in France under the Blum-Bymes Agreements noted in finding 44. A French report by one Devaux describes the settlement approved for the French government on September 6, 1952 (defendant’s exhibit 3, folder No. 3). The report indicates that Raymond Saulnier was indemnified for “irregular use” of the Saulnier '752 patent in the United States during the period December 18,1941, to September 2,1945, at the rate of $4 per canopy for 127,500 canopies, including replacement canopies. There is no evidence that the French settlement negotiations involved any litigation to determine issues of patent validity, patent infringement, or patent accounting.
78. Testimony for plaintiff given by Monsieur Serge Guerbilsky indicates that a settlement was also negotiated *237 on a friendly basis with, the British government (about 1948) for the British wartime use of Saulnier British patent 472,366, and that the total settlement on 26,000 to 27,000 aircraft amounted to about 99,090 British pounds before income taxes. Guerbilsky also testified that the average cost of the British canopies in wartime was about 100 British pounds each. Figuring the British pound at $3.80 in 1948, a settlement amounting to $376,542 (99,090 x 3.8) on 26,500 aircraft cockpit canopies costing $10,070,000 (26,500 x 100 x 3.8) gives a royalty rate of about 3.7 percent of canopy costs, and a canopy rate of about $14 per canopy. Monsieur Guerbilsky testified that he has an interest in the amount of recovery to be entered in the present litigation.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover in the amount of three hundred sixty thousand dollars ($360,000), and judgment is entered to that effect.

 Westinghouse Electric Co. v. Wagner Mfg. Co., 225 U.S. 604, 614-617; Dowagiae Mfg. Co. V. Minnesota Moline Plow Co., 235 U.S. 641, 646 ; Sheldon v. Metro-Goldwyn Corp., 309 U.S. 390, 402-406.

 $994 is the cost of the cheapest canopy assembly listed on the Air Force stock list, mentioned above.