Raymond SAULNIER

v.

The UNITED STATES.

Nos. 471–54, 418–60.

United States Court of Claims.

April 5, 1963.

Rehearing Denied June 7, 1963.

W. Saxton Seward, New York City, and Michael Gould, Washington, D. C., for plaintiff. Surrey, Karasik, Gould & Greene, Washington, D. C., and John P. Heinzen, were on the briefs.

Frances H. Fassett, New York City, with whom was Acting Asst. Atty. Gen., John W. Douglas, for defendant.

Before JONES, Chief Judge, and WHITAKER, LARAMORE, and DURFEE, Judges.

WHITAKER, Judge.

In our previous opinion in this case (180 F.Supp. 412, 148 Ct.Cl. 507, cert. denied 363 U.S. 829, 80 S.Ct. 1601, 4 L.Ed.2d 1525), we held plaintiff's patent was valid and had been infringed by defendant. The case is now before us on the amount of the recovery.

It has been extremely difficult for the parties to ascertain the facts necessary to determine the amount to which plaintiff is entitled. Plaintiff made calls on the respective departments and they answered as best they could, but they were unable to supply us with the data necessary for an accurate determination. The Air Force stated that they could give the price paid for an entire airplane, but not an accurate one for the canopy alone, since they did not require the contractors, from whom the planes were purchased, to give them a breakdown into their various elements. After receipt of our call upon them, the Navy secured estimated cost figures of the canopies from the contractors' computation of the cost of the different parts.

Plaintiff's computations are based on an analysis by a Professor Koppen of the various components of each infringing structure and a computation of the theoretical cost per canopy. We do not regard this as reliable.

One piece of evidence does give definite figures. Plaintiff located and introduced in evidence a United States Air Force stock list, which gave standard prices for parts of the North American F–86 aircraft, which includes the cost of canopies. This shows that one type of canopy assembly cost $14,261, another $9,433, and a third, $994.

█ It is well known that there have been great improvements and refinements in airplanes since World War II ended in 1945. Today, by the pressing of a button or by the pulling of a lever, the canopy flies open and is blown away,.

and the pilot and the seat on which he sits are automatically ejected from a plane. The Trial Commissioner correctly finds, to which no exception was filed:

"It appears reasonable that the highest cost per canopy listed covers installation of an entire canopy assembly including motors, hydraulic control systems, and perhaps explosive jettisoning devices."

A patentee, of course, is only entitled to recover for the value of his invention, not for non-infringing improvements therein.[1] Saulnier's device was a simple one. It consisted of a canopy that slid back and forth on rollers that moved in a track. When the pilot found it necessary to jump out, he rose from his seat and pulled a cord at the top of the canopy which released it from the rollers. Then the pilot gave the canopy a push upward to let the air get under it, which blew it away, and the pilot then jumped out. There were no motors, hydraulic control system, explosive device, or the like.

The cheapest canopy assembly in the United States Air Force stock list, mentioned above, was, no doubt, as good as Saulnier's. The stock list described it as "Canopy, assy-ckpt encl compl", which means, canopy, assembly-cockpit, enclosed, complete. It is not stated that this includes the device for sliding it back and forth, when desired, and for releasing it and letting the wind blow it away, when this was desired; but this was standard equipment, and so, if it was "complete", it must have included it. By introducing it in evidence, plaintiff impliedly vouches for the fact that it did include it. This canopy assembly cost $994.

The Trial Commissioner has set out in his findings Table A, which lists the price of the various canopies as contended for by defendant and by plaintiff. The parties take only minor exceptions to the figures contained in this table.

The table shows the total number of canopies purchased by defendant, in which plaintiff's invention was used, as 12,965. However, there is not included 56 McDonald F3H-1N canopies purchased from 1954-1955. It does include 400 McDonald F2H-3-4 canopies, but the Trial Commissioner finds that there was no proof that these canopies contained the infringing device. However, he has included them in the total, on the assumption that this device was used in all canopies. Since the whole table includes estimates and approximations, we think it was not improper to include these 400 canopies in the number purchased. We adopt the Trial Commissioner's figures on the number of airplanes purchased, with the addition of the 56 McDonald F3H-1N, a total of 13,021.

Defendant's figures on the cost of canopies run from $13,500 down to $719 and three of them as low as $475. The Commissioner arrives at an average cost, according to defendant's figures, of $2,529 per canopy assembly. The average of plaintiff's figures is $6,282. We do not think it is proper to adopt either of these figures, because, of necessity, they are weighted by expensive improvements over plaintiff's simple device, or by added facilities. As we have stated, the United States Air Force stock list introduced by plaintiff lists a canopy assembly at $994, which we must assume utilized plaintiff's device. Any canopy assembly that cost more than this must have contained improvements or added facilities, unconnected with plaintiff's invention, and upon which he is not entitled to a royalty.

The British Government, in settling plaintiff's claim against it for patent infringement, adopted an average figure of $413 per canopy. Mr. Guerbilsky was then, and at the trial of this case before Trial Commissioner Lane, the French attorney for plaintiff, and as such handled for plaintiff the negotiations with

1. Westinghouse Electric Co. v. Wagner Mfg. Co., 225 U.S. 604, 614-617, 32 S.Ct. 691, 56 L.Ed. 1222; Dowagiac Mfg. Co. v. Minnesota Moline Plow Co., 235 U.S. 641, 646, 35 S.Ct. 221, 59 L.Ed. 398; Sheldon v. Metro-Goldwyn Corp., 309 U.S. 390, 402-406, 60 S.Ct. 681, 84 L.Ed. 825.

Great Britain for a settlement of his claim of infringement by this government. He testified that plaintiff and the British Government agreed on prices ranging from 87 pounds, 10 shillings and 4 pence to 130 pounds, the equivalent of $332.50 to $494. This averages $413 per canopy. If we allow for intervening monetary fluctuations, we have a figure of between $500 and $600.

■ Of course, the best guide for the determination of just compensation are the royalties agreed upon between the patentee and licensees in arm-length transactions. Unfortunately, there are no commercial licensees in this case, but the settlement between plaintiff and the British Government does establish a guide. This was negotiated after the war was over. Great Britain was a government foreign to plaintiff, who was a Frenchman. Negotiations lasted over a period of 18 months. A price was agreed upon of $14 per plane for from 26,000 to 27,000 planes, a total consideration of 99,090 British pounds. At the then rate of exchange, this amounts to $376,542.

Concerning this settlement, Mr. Guerbilsky said, " * * * We achieved very satisfactory results for both sides." (Tr. 502.)

Under the Byrnes-Blum Agreement the French Government assumed this country's liability to French citizens for patent infringement during World War II. Plaintiff presented to it a claim for infringement by the United States, and settled its claim for the period December 18, 1941 to September 2, 1945 at $4 a canopy for 127,500 canopies. This compares with $14 a canopy agreed upon with the British Government.

We can only indulge in speculation as to the reason for plaintiff's settlement with his own government at a figure so much lower than that he secured from Great Britain, but, be that as it may,

the settlement with Great Britain being an arm's-length transaction, is much the better guide. If we adjust this settlement for the difference in the economy then and now, we have a figure of about $18 per canopy, or a total amount of $237,996.

Had the parties entered into negotiations for a license to use plaintiff's invention on the basis of 13,000 planes, the canopies on which were expected to cost, say $1,000 per canopy, or a total cost of about $13 million, we think the parties might well have agreed upon a royalty at the approximate rate of 3 percent on the first $5 million (instead of the first $1 million recommended by the Trial Commissioner, influenced by our decision in Badowski v. United States, 278 F.2d 934, 150 Ct.Cl. 482), and 2 percent on the excess. At $1,000 per canopy[2] this would amount to $310,000. This is to be compared with the royalty agreed upon in the British settlement, adjusted for monetary fluctuations, which amounts to $237,996.

We are obliged to enter a judgment somewhat in the nature of a jury verdict. Taking all the foregoing into consideration, we think the compensation, which is just to both parties, amounts to the sum of $250,000.

■ We do not know the date of defendant's purchases, nor the rate of them in the seven years between December 9, 1948 and August 2, 1955. Taking an intermediate date of 3½ years, and allowing 4 percent per annum for delay in payment, plaintiff is entitled to recover an additional sum of $110,000 for delay in payment.

Judgment will be entered in plaintiff's favor for the sum of $360,000.

DAVIS, Judge, did not participate in the consideration and decision of this case.

**2.** $994 is the cost of the cheapest canopy assembly listed on the Air Force stock list, mentioned above.