**DEERE & COMPANY,**
**Plaintiff-Appellee/Cross-Appellant,**

v.

**INTERNATIONAL HARVESTER COMPANY,**
**Defendant-Appellant/Cross-Appellee.**

**Appeal Nos. 83–565, 83–566.**

United States Court of Appeals, Federal Circuit.

June 27, 1983.

---

Stephen C. Neal, Chicago, Ill., argued for appellant. With him on the brief were Richard C. Godfrey and Andrew R. Running. John L. Cline, F. David AuBuchon and Robert L. Harmon, Chicago, Ill., of counsel.

Raymond L. Hollister, Moline, Ill., argued for appellee. With him on the brief were H. Vincent Harsha, Virgil Bozeman and John V. Patton, Moline, Ill. Also on the brief were Robert H. Fraser and Louis A. Mok, Los Angeles, Cal., of counsel.

Before MARKEY, Chief Judge, and DAVIS and BALDWIN, Circuit Judges.

BALDWIN, Circuit Judge.

This is a consolidated appeal from a judgment of the United States District Court

for the Central District of Illinois, entered October 8, 1982, awarding Deere $28,462,-664, or 15% of International Harvester's (IH) net sales of a corn-harvesting device (corn head) previously adjudged to infringe a patent owned by Deere. *Deere & Co. v. International Harvester Co.*, 658 F.2d 1137, 211 USPQ 11 (7th Cir.), *cert. denied*, 454 U.S. 969, 102 S.Ct. 514, 70 L.Ed.2d 386 (1981). In an unpublished decision, the district court held that the 15% figure constituted a "reasonable royalty" pursuant to 35 U.S.C. § 284, but denied Deere prejudgment interest on Deere's claim of patent infringement. We affirm-in-part, reverse-in-part, and remand for further consideration.

*Background*

A "corn head" is an apparatus commonly attached to a mobile crop-processing machine, or combine, for use in harvesting corn. Generally, a corn head comprises a series of gathering devices (row units) mounted side-by-side in the front of the combine at intervals corresponding to the spacing of corn rows in the field, thereby permitting the simultaneous harvesting of the rows and the continuous feeding of corn ears into the combine for further processing. The arrangement of combine with corn head is illustrated below:

A. COMBINE
B. CORN HEAD
C. ROW UNITS
D. DRIVE SHAFT

In April, 1976, Deere instituted a suit for patent infringement as a result of the commercial introduction by IH two years earlier of its IH 800 series corn head. In 1978, the district court concluded that a patent assigned to Deere (Schreiner patent)[1] was valid and infringed by the IH 800 corn head. The district court enjoined further manufacture and sale of the IH 800 series and, moreover, awarded Deere treble damages (then undetermined), including interest, costs, and attorneys fees, on the ground that IH's conduct constituted an "exceptional case of wilful infringement."

During subsequent proceedings, including two appeals to the Court of Appeals for the Seventh Circuit, the district court's judgment on validity and infringement was sustained, but its ruling on the case's "exceptional" nature was reversed by the Seventh Circuit, which found "[n]o evidence of bad faith conduct" by IH. Thereafter, the cause was remanded to the district court for an accounting.

1. The patent in suit is U.S. Patent No. 3,589,-110, entitled "Gear Drive and Support for Corn-Harvesting Unit," which issued to Dale Schreiner and Joseph J. Shindelar on June 29, 1971.

### District Court Opinion

At the accounting trial, Deere argued that it had suffered lost profits with respect to approximately 21% of IH's production of the IH 800 series between 1974 and 1980. As to the remainder of IH's production, Deere contended it was entitled to a royalty of 20% of net IH sales (an average of about $270 per row unit), plus an award of pre-judgment interest and an adjustment for inflation over the infringement period.

In response, IH opposed both an inflation adjustment and an award of prejudgment interest, and urged that Deere had not proved it had suffered a determinable amount of lost profits. Furthermore, IH argued that an "established royalty" of $7.50 per row unit (or, alternatively, a "reasonable royalty" in essentially the same amount) was applicable, with a ceiling on Deere's recovery of $1,000,000. In support of an established or reasonable royalty in the case, IH referred to various licenses in the farm equipment field, including a license covering the Schreiner patent granted in 1977 by Deere to White Motor Corporation, a competitor of Deere's which had held 3% or less of the market during the relevant period. The license agreement (White license), which was negotiated during the pendency of Deere's suit against IH, specified a royalty rate of something less than 1%, with decreases in the rate in the event one or more patent claims were held invalid in the course of Deere's action against IH. IH also presented evidence of two offers by Deere, made, respectively, in 1973, before IH commercialized the infringing IH 800 series, and in 1977, after Deere commenced the present action, to license the Schreiner patent to IH at a royalty rate of approximately 1%.

While agreeing with IH that Deere had failed to establish lost profits, the district court held there was no established royalty in the case. Specifically, the court concluded that the White license was "irrelevant" to determining either an established royalty or a reasonable royalty, and, in fact, was inadmissible under Rule 408, Federal Rules of Evidence.[2] The offers by Deere to license IH were similarly characterized as not relevant, and, in any case, inadmissible under Rule 408.

Having thus rejected IH's proffered evidence concerning Deere's licensing and offers to license the Schreiner patent, the district court stated that:

> In determining a reasonable royalty, such factors as increased profitability, market share, cost savings, and collateral benefits from the sales of related products are to be considered. In addition, the reasonable royalty allowed should take into consideration that which would be accepted by a prudent licensee who wished to obtain a license but was not so compelled, and by a prudent patentee who wished to grant a license but was not so compelled. The "negotiations" of such theoretical parties should not be viewed, however, as taking place in a vacuum. Each party would weigh the expected benefits against the expected costs of entering into a license agreement, and all known existing economic factors would be considered by them and would enter into their respective decision-making processes.

The court expressly found "no significant help on the problem here in other licenses between other parties involving other patents in the farm equipment industry, or in the assertion that 'almost invariably' past license agreements between Deere and IH had included a ceiling or paid-up amount." Rather, the district court emphasized that:

> Corn being by far the largest crop in the United States, corn heads made possible

2. Rule 408 provides, inter alia, that:
   Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible.

the harvesting of corn with a combine and thus created a vast additional market for combines. To be a viable supplier of combines, it is absolutely essential for an agricultural equipment manufacturer to have desirable corn heads to go with them, because the corn crop is harvested primarily by combines fitted with corn heads. In IH's case, some 70% of its combines are sold with corn heads, and if unable to supply acceptable corn heads, IH's combine production would have to be reduced by about 60%. Because the profit realized from combine sales is about three times that derived from corn head sales, there is a powerful economic incentive to protect combine sales.

\* \* \* \* \* \*

At the time infringement began, Deere was making, and stood to make in the future, a profit of over 35% of net selling price on each corn head it sold; but it was running into plant capacity problems which could limit its production. So, as a prudent patent holder, Deere should have desired to license a substantial manufacturer at a percentage royalty, which would be something less than 35% of the licensee's sale price but would maximize Deere profits.

Foreseeing the dismal future of [IH's own, noninfringing] corn head and the bright future of the infringing 800 Series, \* \* \* as a prudent licensee, IH should have been willing to pay a very substantial percentage of net sales royalty, even exceeding its expected profit on corn heads, to protect its combine sales and profits.

In view of the foregoing, the district court found that, "[u]nder all the circumstances of this case, fifteen percent of net sales is the reasonable royalty rate, at or above which the damage award is mandated by the statute (35 U.S.C. § 284). Anything less would be unreasonable." The district court concluded, however, that "[u]nder the law of this case, and generally in this [the Seventh] Circuit, there is no 'exceptional circumstance' justification for prejudgment interest, or for any further adjustment for inflation." (citations omitted)

### Arguments on Appeal

IH's challenge to the findings and conclusions of the district court proceeds along two basic fronts. First, IH argues that the royalty rate of 15% of net sales is excessive in light of the proffered evidence of Deere's actual licensing behavior and is otherwise not supported by the record. More specifically, IH contends that the district court erred by "refusing to consider" the White license and the two offers by Deere to license IH as "the most relevant evidence" or an established royalty (or, alternatively, a reasonable royalty) in the neighborhood of 1%, rather than 15%. According to IH, the district court erroneously excluded the evidence of Deere's licensing practices, and compounded that error by preventing discovery directed to the amount for which Deere would have been willing to license the Schreiner patent.

As the second ground for its appeal, IH argues that the district court improperly based its award of a reasonable royalty on the premise of hypothetical negotiations during which the "willing licensor" engaged in conduct which, in fact, would have constituted patent misuse and a violation of antitrust law. In particular, IH alleges that "the district court based its award, at least in large part, on Deere's supposed right to receive compensation for sales of combines, a collateral product." According to IH, the district court thus erred "by basing its royalty award on the IH 800's entire market value," as a consequence of the court's holding, also erroneously, "that under the willing buyer and willing seller rule, the willing seller is entitled to compensation both for its patented product and for any leverage that product affords over unpatented products."

For its part, Deere takes issue with the district court's denial of what Deere calls

"delay compensation," that is, compensation from early 1974 for the delay involved in Deere's action against IH. Arguing that this court is not bound by Seventh Circuit case law on the subject, Deere contends the requirement of "exceptional circumstances" for an award of delay compensation penalizes the patentee and contravenes the mandate of 35 U.S.C. § 284 regarding "adequate compensation" and "interest," as construed in *Aro Mfg. Co. v. Convertible Top Replacement Co.,* 377 U.S. 476, 505–06, 84 S.Ct. 1526, 1542, 12 L.Ed.2d 457 (1964).[3]

## OPINION

### Deere's Actual Licensing Practices

At the outset, we note that the district court was careful to delineate its pronouncements on relevance and admissibility, respectively, seemingly to preserve each issue separately for appellate review.[4] The district court did not make a distinction, however, between evidence of little probative value and evidence considered not relevant, the latter being inadmissible under Rule 402, Federal Rules of Evidence. Nevertheless, the district court's purposeful treatment of IH's proffered evidence in the alternative, its failure to mention Rule 402, and its citation of court opinions dealing with evidence variously found to be unpersuasive (as opposed to irrelevant) convince us that the district court did not rule the proffered evidence inadmissible under both Rule 408 and Rule 402 and, hence, not to be considered in either case. Rather, we read the pertinent findings and conclusions of the district court together as stating that the proffered evidence on Deere's licensing practices was deemed to be inadmissible

under Rule 408 or, alternatively, to be of little or no significance to the issues of an established royalty or a reasonable royalty. We will address these assertions seriatim.

■ (1) *Admissibility Under Rule 408:* The district court's rationale for ruling inadmissible IH's evidence of Deere's 1973 and 1977 offers to license the Schreiner patent was succinctly stated as follows:

An offer to license a patent, which does not result in agreement because considered unacceptably high by the offeree, is an attempt to compromise a disputed claim, at least as to amount, and is also made in compromise negotiations. Hence, such an offer cannot be admissible on the issue of "established royalty" or reasonable royalty, under Rule 408, Federal Rules of Evidence.

Rule 408, however, expressly relates to evidence of efforts toward "compromising or attempting to compromise a *claim* which *was* disputed as to either validity or amount." Fed.R.Evid. 408 (emphasis added). While Deere's 1977 offer to grant IH a license may be properly considered an offer to settle a "claim" (patent infringement) which was then in dispute, both as to validity and amount, we cannot identify a similar "claim" over which the parties were in disagreement when Deere first offered to license the Schreiner patent in 1973. Indeed, the parties agree that IH was not infringing the Schreiner patent at the time of the 1973 offer, and the district court so found.

It may well be, as Deere urged during oral argument, that the past dealings between Deere and IH were such that an eventual court battle involving the Schrein-

---

**3.** In relevant part, 35 U.S.C. § 284 provides that:

Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

**4.** For example, the district court stated in a footnote that "the matters [pertaining to the Deere offers and the White license] are considered irrelevant, and evidence thereof is held to be inadmissible under Rule 408, Federal Rules of Evidence. Those facts are found, nevertheless, should a court of review disagree on the admissibility of the evidence supporting same and/or the relevance thereof on the issue of damages herein."

er patent was an acknowledged possibility or even probability. Nevertheless, Rule 408, on its face, is limited to actual disputes over existing claims and, accordingly, cannot be applicable to an offer, albeit one ultimately rejected, to license an, as yet, uncontested patent. We conclude, therefore, that the district court erred as a matter of law by ruling evidence of Deere's 1973 offer inadmissible under Rule 408.

Similarly, we believe the district court erred in applying Rule 408 to the White license. Neither the district court's findings nor any evidence of record suggests that White Motor Corporation ever infringed the Schreiner patent or that Deere entertained some other, disputed claim against White Motor Corporation which might have been settled by Deere's granting the White license. Therefore, we can discern no basis for treating the White license as inadmissible evidence under Rule 408 of a completed compromise with a third party not involved in the present litigation. Moreover, the fact that the White license was negotiated while IH and Deere were locked in dispute over validity and infringement of the Schreiner patent does not render the White license itself inadmissible evidence of a settlement by Deere of a "disputed" claim. Rule 408, therefore, is simply inapposite.

■ (2) *Probative Value:* In support of its conclusion on the weight to be given the White license, the district court cited *Rude v. Westcott,* 130 U.S. 152, 165, 9 S.Ct. 463, 468, 32 L.Ed. 888 (1889), and *Saf-Gard Products v. Service Parts,* 491 F.Supp. 996, 1008, 206 USPQ 976, 986 (D.Ariz.1980), apparently for the proposition that a single license, paid or secured by one, relatively minor competitor after the onset of the complained infringement, may be rejected as a measure of damages against an infringer. We have no doubt that this is an accurate statement of the relevant law, nor can we find error in its application by the district court to the White license, to the extent that the court considered the probative value of the White license to be vanishingly small.[5]

In the absence of any evidence indicating a general acceptance within the farm equipment industry of a particular market value for the Schreiner patent, we cannot say that the district court's conclusion of no established royalty in this case is erroneous. *See Rude v. Westcott,* 130 U.S. at 165, 9 S.Ct. at 468. Moreover, as the White license was negotiated against a backdrop of continuing litigation and IH infringement of the Schreiner patent, the district court could properly discount the probative value of the White license with regard to a reasonable royalty. *See, e.g., Tights, Inc. v. Kayser-Roth Corp.,* 442 F.Supp. 159, 164–65, 195 USPQ 750, 754–55 (M.D.N.C.1977).

Similarly, the district court's finding no significant persuasive value in Deere's 1973 offer to license the Schreiner patent is not erroneous. In 1973, Deere faced a major competitor that had, on its own initiative, approached Deere for a license under an untested patent of indeterminate value. For the district court to consider Deere's royalty offer under such circumstances to be of little or no usefulness in determining a reasonable royalty does not constitute error as a matter of law.[6]

(3) *Summary:* In our analysis to this point, we have concluded that the district court erred in ruling the White license and Deere's 1973 offer inadmissible under Rule

---

5. IH takes the position that the district court erroneously *refused* to consider the White license and other evidence of Deere's licensing behavior. We have already determined, however, that the district court treated the evidence as inadmissible (and, hence, not to be considered) or, alternatively, without significant evidential weight. Accordingly, we find that the district court duly considered IH's evidence and decided it was unpersuasive.

6. *A fortiori,* it follows that the district court's weighting of the 1977 offer, which was tendered in the midst of litigation in which Deere held no clear edge, could not be considered erroneous even had evidence of the offer been ruled admissible below.

408 as evidence of an established or reasonable royalty. But we have also concluded that the district court's determination that the White license and the 1973 offer are of little or no probative value to the damages question should be sustained. Accordingly, we hold that the district court's erroneous application of Rule 408 did not affect the substantial rights of the parties and, therefore, constituted harmless error under Rule 61, Federal Rules of Civil Procedure.

*Discovery Sought by IH*

■ In its briefs and again during oral argument before this court, IH has alluded to the district court's alleged error "[p]reventing discovery on the key issue of the amount for which Deere would have been willing to license the Schreiner patent." The precise nature of the court's "error" in this context is unclear. IH has identified three instances where it says discovery was improperly cut off,[7] but the extreme breadth of the requested discovery, as well as the arguably privileged nature of some of the material sought, undercuts IH's contention. Suffice it to say that, in the absence of more detailed and convincing allegations, we are unpersuaded that the district court abused its broad discretion in delimiting discovery before trial.

*The District Court's Determination of a Reasonable Royalty*

Aside from challenging the district court's weighting of the proffered evidence on Deere's licensing practices, IH argues that the record before the district court did not support the award of a 15% royalty

rate. Also, IH contends that the district court failed to identify the evidence it relied on to arrive at that figure. We find both positions unconvincing.

■ The district court expressly identified numerous factors to be considered in determining a reasonable royalty, including increased profitability and cost savings, which were the subject of extensive investigation at trial. The district court heard, for example, the testimony of Dr. Conway, Deere's expert, concerning the "breakeven" royalty rate a prudent business entity in 1973 would have used in licensing the Schreiner patent, had the entity been in the position of IH (14.7%) or Deere (17%).[8] The district court also expressly found that Deere was making, and stood to make in the future, a profit on the net selling price of its corn head in excess of 30%, a figure for which the record below provided support. The record similarly supported the district court's finding that Deere, facing limits on its own corn-head production, would have been willing to license "a substantial manufacturer" at something less than 35% of the licensee's sales price, and that IH, recognizing "the dismal future" of its own corn head and "the bright future of the infringing 800 series," would have been willing to pay a royalty comprising "a very substantial percentage of [IH's] net sales."

In view of the foregoing, we cannot say that the district court's findings supportive of the reasonable royalty award are clearly erroneous, or that the 15% royalty rate is excessive as a matter of law.[9]

*The District Court's Consideration of Collateral Sales*

■ We need not pause long in disposing of IH's argument that the district court

---

**7.** The instances involved an IH interrogatory to Deere seeking details of all Deere licenses pertaining to farm equipment granted between 1970 and the date Deere became aware of IH's infringing activities, an IH request for all documents relating to any offers by Deere to license its corn head patents, and trial subpoenas directed by IH to Deere's President, General Counsel, Senior Vice President, and several of Deere's attorneys.

**8.** IH maintains that Dr. Conway's testimony was "inconsistent with and indeed contrary to the economic reality of Deere's licensing prac-

tices." But as we have already concluded, the district court's assessment of the evidence concerning Deere's actual licensing behavior was not erroneous. Similarly, we cannot say that the district court erred in its counterbalancing of Dr. Conway's testimony against the other evidence before it.

**9.** Indeed, the district court, as quoted above, recognized that 35 U.S.C. § 284 expressly mandates "damages adequate to compensate" for patent infringement, and that, under the statute, a "reasonable royalty" is the minimum permissible measure of damages.

somehow presupposed patent misuse and antitrust violations by a hypothetical willing seller in basing its royalty award on what IH terms "the IH 800's entire market value." In fact, the district court did nothing more or less than take into account the impact of anticipated collateral sales of an admittedly noninfringing product line on the respective bargaining positions of the parties engaged in the theorized licensing negotiations. We consider this an eminently reasonable approach to the willing seller-willing buyer analysis, see *Union Carbide Corp. v. Graver Tank & Mfg. Co.,* 282 F.2d 653, 671–72, 127 USPQ 3, 17 (7th Cir.1960), *cert. denied,* 365 U.S. 812, 81 S.Ct. 695, 5 L.Ed.2d 691 (1961), *Georgia-Pacific Corp. v. United States Plywood Corp.,* 318 F.Supp. 1116, 1131–32 (S.D.N.Y.1970), *modified and aff'd,* 446 F.2d 295, 170 USPQ 369 (2d Cir.), *cert. denied,* 404 U.S. 870, 92 S.Ct. 105, 30 L.Ed.2d 114 (1971), particularly in this case, where the worth of the contested patent cannot be realistically divorced from the value both IH and Deere placed on their respective shares in the combine market. Recognition of this fact by the district court does not constitute the court's imprimatur on a tying arrangement, implicit or otherwise. Contrary to IH's argument, the district court in no way assumed that a willing licensor would *condition* the grant of a license under the Schreiner patent on the purchase of any unpatented product. Compare *Rex Chainbelt v. Harco Products,* 512 F.2d 993, 1000–03, 185 USPQ 10, 14–16 (9th Cir.), *cert. denied,* 423 U.S. 831, 96 S.Ct. 52, 46 L.Ed.2d 49 (1975) (label license on container of unpatented epoxy resin, as sole noninfringing means to use patented invention employing resin, constituted tying of resin to right to practice patented invention).

*Prejudgment Interest*

██ In denying Deere prejudgment interest, the district court expressly relied on Seventh Circuit precedent to the effect that, under § 284, prejudgment interest should not be awarded in the absence of "exceptional circumstances." *See, e.g., Columbia Broadcasting System v. Zenith Radio Corp.,* 537 F.2d 896, 192 USPQ 68 (7th Cir.1976). Since the district court handed down its decision, however, the United States Supreme Court has held that, "[o]n the face of § 284, a court's authority to award interest is not restricted to exceptional circumstances, and there is no warrant to imposing such a limitation." *General Motors Corp. v. Devex Corp.,* —— U.S. ——, ——, 103 S.Ct. 2058, 2061, 76 L.Ed.2d 211 (1983). The Supreme Court also has stated that § 284 provides "that interest shall be 'fixed by the court,' and in our view it [§ 284] leaves the court some discretion in awarding prejudgment interest." —— U.S. at ——, 103 S.Ct. at 2063.

Accordingly, the district court's denial of prejudgment interest based on the absence of "exceptional circumstances" is reversed, and the case is remanded for further consideration in light of *General Motors Corp. v. Devex Corp.,* supra.

MODIFIED AND REMANDED.

DAVIS, Circuit Judge, dissenting in part.*

1. Unlike the court, I think the District Court never treated Deere's offer to IH and Deere's license to White as other than wholly inadmissible (and therefore not to be considered at all)—and never decided, even alternatively, that that offer and license were of little or lesser probative value (and therefore outweighed by the other evidence in the case). The court's findings of fact and legal conclusions show that this was the trial judge's position. Footnote 5 says squarely that the facts of the IH offer and White license "are considered irrelevant, and evidence thereof is held to be inadmissi-

---

* I agree with (1) the court's discussion upholding the admissibility under Rule 408, Federal Rules of Evidence, of Deere's offer to International Harvester (IH) and of Deere's license to White Motor Company (White), and (2) the court's discussion and disposition of Deere's appeal on pre-judgment interest (No. 83–566).

ble under Rule 408, Federal Rules of Evidence." As the majority rules (and I agree), the holding of inadmissibility under Rule 408 was erroneous. As for "irrelevance" (or the synonym "not relevant"[1]), Rule 402 of the Rules of Evidence provides that "Evidence which is not relevant is not admissible." I conclude therefore that the District Court simply held these two circumstances—the IH offer and the White license—to be entirely inadmissible, *i.e.*, not to be weighed at all. Nothing else in the court's findings or conclusions of law persuades that, although the court used (apparently deliberately) the accepted legal term "irrelevant," it really meant "of little probative value." The fact that the court said in footnote 5 that it found those particular facts because a reviewing court might "disagree on the admissibility of the evidence supporting same and/or relevance thereof on the issue of damages herein" means no more than a statement that the appellate court should know the facts if it considered the trial court's legal holdings erroneous and therefore wished to consider reversing.

2. The IH offer and the White license should have been considered. On the error of excluding under Rule 408 the IH offer and the White license I need add nothing to the majority opinion. Relevance under Rule 402 is also plain. The Court of Claims held that "one or more" licenses (even in settlement with others) furnish a relevant component for determining recovery. *Bendix Corp. v. United States,* 676 F.2d 606, 616 (Ct.Cl.1982); *Pitcairn v. United States,* 547 F.2d 1106, 1118, 212 Ct.Cl. 168, 192 USPQ 612, 622 (Ct.Cl.1976), *cert. denied,* 434 U.S. 1051, 98 S.Ct. 903, 54 L.Ed.2d 804 (1978); *Saulnier v. United States,* 314 F.2d 950, 161 Ct.Cl. 223, 137 USPQ 222 (Ct.Cl.1963). *See also Columbia Broadcasting Systems, Inc. v.*

*Zenith Radio Corp.,* 537 F.2d 896, 898, 192 USPQ 68, 70 (7th Cir.1976); *Beatty Safway Scaffold Co. v. Up-Right, Inc.,* 306 F.2d 626, 632, 134 USPQ 379, 384 (9th Cir.1962), *cert. denied,* 372 U.S. 934, 83 S.Ct. 881, 9 L.Ed.2d 766 (1963). *Pitcairn, supra,* also ruled that a deliberate prelitigation offer by the patentee is to be taken into account.

3. The District Court's error in failing to consider the IH offer and the White license was not insignificant. These were the only offers or licenses by Deere (with respect to this patent) that were before the court below. They clearly had a substantial bearing on the reasonable compensation to which Deere was entitled for infringing use of the invention. *See Trio Process Corp. v. L. Goldstein's Sons, Inc.,* 612 F.2d 1353, 1358, 204 USPQ 881, 884 (3rd Cir.), *cert. denied,* 449 U.S. 827, 101 S.Ct. 91, 66 L.Ed.2d 30 (1980). I do not say that they demonstrated the upper limit of Deere's recovery, or that Deere was restricted to the specific rate provided in that offer and license. *Cf. Tektronix, Inc. v. United States,* 552 F.2d 343, 347–351, 213 Ct.Cl. 257, 193 USPQ 385, 390–93 (1977), *cert. denied,* 439 U.S. 1048, 99 S.Ct. 724, 58 L.Ed.2d 707 (1978); *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152, 1158, 197 USPQ 726, 731 (6th Cir.1978). I do say that that evidence was pertinent and should have formed an important basic factor in the trial court's evaluation of the proper compensation.

4. Another important error of the District Court was its loading into its determination of the 15% royalty rate of a *"very substantial percentage* of net sales royalty, *even exceeding [IH's] expected profit in corn heads,* to protect its combine sales and profits" (emphasis added). (Fdg. 29).[2] Since neither Deere's nor IH's combines

---

1. Conclusion of Law No. 5 declares that the White license is "not relevant."

2. In finding 10, the District Court found the following with respect to the relationship between sales of corn heads and of combines: The substantial reduction in revenue from corn head sales that IH faces is self-evident

from its own projections. However, their full significance can only be appreciated by placing them [corn head sales] in the context of the relationship between corn head and combine sales. Corn being by far the largest crop in the United States, corn heads made possible the harvesting of corn with a combine and thus created a vast additional mar-

was at all covered by the Schreiner patent (which pertained only to corn heads), this amounts to holding that IH would have foregone all of its profits on the patented article—and even eaten into its corn head costs, thus incurring a loss on the patented article—in order to save its own combine business. Conceivably, IH might in fact have voluntarily (though possibly without legal basis) agreed to such a drastic arrangement, but to me it seems improper for a court to impose that component in a "willing buyer-willing seller" analysis. Deere could not explicitly condition a license under the corn head patent upon IH's paying such tribute to Deere either on IH's combine sales or on Deere's loss of combine sales. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 136–37, 89 S.Ct. 1562, 1583, 23 L.Ed.2d 129 (1969); *Rex Chainbelt, Inc. v. Harco Products, Inc.,* 512 F.2d 993, 1000–1003, 185 USPQ 10, 14–16 (9th Cir.), *cert. denied,* 423 U.S. 831, 96 S.Ct. 52, 46 L.Ed.2d 49 (1975). But what the District Court did here was, in effect, to mandate just such an improper tieing relationship, in the guise of assuming that IH would agree to it. *See Velo-Bind, Inc. v. Minnesota Mining & Mfg. Co.,* 647 F.2d 965, 972, 211 USPQ 926, 933 (9th Cir.), *cert. denied,* 454 U.S. 1093, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981). The court either allowed Deere to recover in this suit a good portion of its own lost combine sales or the court gratuitously transferred from IH to Deere a portion of the former's combine profits—each factor being forbidden to the patentee under our law.

5. For these reasons, I would reverse the judgment below in No. 83–565 and remand for a determination, on the proper basis, of

Deere's compensation for infringement of its corn head patent. *See Bandag, Inc. v. Gerrard Tire Company, Inc.,* 704 F.2d 1578 (Fed.Cir.1983). As indicated above (footnote \*), I join in reversal as to No. 83–566 (pre-judgment interest).

---

ket for combines. To be a viable supplier of combines, it is absolutely essential for an agricultural equipment manufacturer to have desirable corn heads to go with them, because the corn crop is harvested primarily by combines fitted with corn heads. In IH's case, some 70% of its combines are sold with corn heads, and if unable to supply acceptable corn heads, IH's combine production would have to be reduced by about 60%.

Because the profit realized from combine sales is about three times that derived from corn head sales, there is a powerful economic incentive to protect combine sales. IH's Vice President of Harvesting Technology, Mr. Wells, agreed that whoever is going to sell combines must have an acceptable corn head, and that it would have been an "absolute disaster" for IH not to have been able to sell its combines.