**ELECTRIC PIPE LINE, Inc., Plaintiff,**

v.

**FLUID SYSTEMS, Inc., Defendant.**

**Civ. A. No. 4802.**

United States District Court

D. Connecticut, Civil Division.

May 12, 1955.

As Amended June 20, 1955.

James E. Nolan, Strauch, Nolan & Diggins, Washington, D. C., for plaintiff.

Rockwell & Bartholow, New Haven, Conn., for defendant.

3. See also McGhee v. General Finance Corporation, D.C.W.D.Va.1949, 84 F.Supp. 24.

ANDERSON, District Judge.

The defendant is the owner of United States Letters Patent No. 2,224,403. The plaintiff has brought a declaratory judgment action in three counts claiming (1) that the patent is invalid, that it is unenforceable because of the defendant's misuse of it and that it is not infringed by the plaintiff; (2) damages and an injunction for the defendant's violation of the anti-trust laws; and (3) damages and an injunction for the defendant's acts of unfair competition. The defendant has counterclaimed for infringement and contributory infringement of the patent. The parties are at issue on these claims.

### Findings of Fact

1. Patent No. 2,224,403, now owned by the defendant, a Connecticut corporation, was issued December 10, 1940, to Harold A. Lines of West Haven, Connecticut.

2. The patent relates to electrical heating of the storage and transportation system for viscous liquids, particularly the transportation of heavy fuel oil from a storage tank to an oil burner.

3. At the time of the issuance of the patent and continuously since that time, it was found desirable for purposes of economy in heating hospitals, schools, public and large commercial buildings by means of oil to use very heavy grades of oil such as Nos. 5 and 6, sometimes called Bunker C, which has a high viscosity.

4. To transport such oil from supply tank to burner, it is necessary to apply heat to the oil to reduce the viscosity and render it readily flowable for pumping.

5. In the years immediately prior to and for some years following the issuance of the patent, the viscosity of this heavy oil used for oil burners was reduced by steam or hot water, immersion or spot heaters on the pipe lines, and coils inside of the supply tank.

6. The steam and hot water method was cumbersome, and it was expensive in time and money. Where buildings were not in use for a period of time such as over a week-end, it was necessary to keep the heating device running and the oil circulating, for, if the flow were discontinued, the high viscosity would return in the areas of the system not immediately adjacent to the heaters, and great difficulty would be experienced in getting the flow started again.

7. At the time of the issuance of the patent there existed, therefore, a problem of achieving a simple and economical method of maintaining a low viscosity in the oil used in these systems, particularly a method which would not require the heating of all the oil in the supply tank.

8. The Lines patent was addressed to a solution of this problem. The three claims of the patent in issue are No. 4 which discloses a process, and Nos. 14 and 15 which disclose a unitary system or combination to achieve a specific result.

9. The patent shows a system for transporting oil from a tank to a burner and applying a current to the walls of the pipe to heat the pipe by its resistance to the current and, therefore, maintain the oil in flowable condition, at the same time delivering oil in excess quantity to the burner and returning the excess to the supply tank at a point immersed in the cold oil in the tank and adjacent the point of suction of the supply pipe whereby the heated oil is again drawn into the suction pipe with new oil, without being diffused through the cold oil in the tank.

10. The assembly of oil-conducting pipes called the "tank unit" which, in the patented system, goes down into the oil in the supply tank, consists of concentric pipes, with the suction pipe about half the diameter of the larger return pipe. The suction pipe is somewhat shorter than the return pipe, and metal connections called "tongues" run from the bottom of the suction pipe to the bottom of the return pipe and form part of the circuit for the electricity which heats the pipes. This circuit runs through all or a substantial part of the oil conducting pipes, although the patent recognizes it may in some instances be

desirable to heat only certain sections of the conductor pipes. The end of the return pipe is a short distance above the bottom of the inside of the oil supply tank.

11. For the most part the items which go to make up the patented system such as the thermostat, transformer, insulated flanges, etc., are old and unpatented although some are specially modified or designed for this purpose.

12. The defendant does not install its system but designs the system and sells component parts for it. It also furnishes the instructions for installation, inspects the installation and furnishes a performance guarantee. Otherwise it does not practice the method of claim 4 of the patent, nor does it manufacture or install the system recited in claims 14 and 15.

13. Initially the defendant had difficulty in securing public acceptance of the patented system; but, from gross sales of $6,641 in the year ending May 31, 1946, its business showed a steady increase to $291,640 for the year ending May 31, 1954, and a total of $246,886 for the following eight months.

14. William J. Trabilcy of Englewood, New Jersey, and Eugene J. Maupai, of Ridgewood, New Jersey, were owners of a majority of the stock in M. & T. Engineering Co., a New Jersey corporation, which was engaged in the business of installing oil burner systems.

15. In 1953, the plaintiff corporation was formed under the laws of New Jersey by Trabilcy and Maupai to sell a system to accomplish the same purposes for oil burner installations as that taught by the defendant's patent. They own a substantial majority of the shares in the corporation. Trabilcy is president of both M. & T. Engineering Co. and the plaintiff and Maupai is an officer of both of them.

16. The plaintiff sold component parts and instruction drawings for the installation of such a system.

17. While the plaintiff did not actually install the system, the companion company, M. & T. Engineering Co., did.

Except through M. & T. Engineering Co., the plaintiff does not practice the method of claim 4 of the patent in suit, nor does it manufacture or install the system recited in claims 14 and 15.

18. When the plaintiff commenced business and before actually making any sales, it offered the system for sale and the instruction drawing then held out to the public showed a drawing of the tank unit (Exhibit B) which was an exact copy of the defendant's tank unit.

19. On protest by the defendant, the plaintiff withdrew its instruction drawing and later presented for sale a modified system, Exhibits 8a and 8b, for which it has continued to sell instruction drawings and parts up to the present time; and this is the claimed infringing system.

20. The plaintiff's present system includes a tank unit composed, not of two concentric pipes, but of two parallel pipes five and one-half inches apart held together at their lower ends near the inside bottom of the oil supply tank by a metal hood or "bell" which keeps the hot return oil from being diffused through the mass of cold oil in the tank.

21. Of this tank unit the return pipe is of metal but the suction pipe is of fiber. Down through the full length of the center of the fiber suction pipe is a metal "rod heater."

22. At the top of the tank unit outside the oil supply tank there are on the return and suction pipes insulated flanges so that no electricity is conducted through the pipes within the tank except for the rod heater.

23. To both the plaintiff's and defendant's systems there have been added electric immersion heaters. In the plaintiff's system it is on the suction or supply pipe line between the tank and the burner. On the defendant's it is located on the return pipe line between the burner and the tank. This immersion heater is an added refinement to the defendant's system; it is not shown in its patent and is not necessary for the functioning of its system.

24. Except for a few other minor differences the systems are substantially alike.

25. The plaintiff's system is designed to operate in such a way that, if it were being started up after being completely shut down and with cold oil in the tank and conduits, heat would be applied through the electric circuit in the pipes, in the rod heater in the suction pipe in the tank unit and through the immersion heater until the oil in the suction pipe in the tank and in the pipe lines outside of the tank is warm enough to be pumped, then by a cut-out switch the electric circuits, just mentioned, would be turned off, with the exception of the immersion heater, and in the same instant the pump and oil burner would be turned on and the system would run with them and the immersion heater as long as the burner called for oil. A cooling of the system following the completion of the operation of the burner and a raising of the degree of viscosity of the oil, would again require the application of heat to the pipes and in the suction pipe of the tank unit to make the oil fluid and flowable again.

26. The part of the system used by the plaintiff initially to reduce the viscosity of the oil in the transportation conduits as an essential prerequisite to its flow and the return of the hot oil adjacent to the suction pipe and the drawing up of the hot oil with new oil in the suction pipe are substantially the equivalents of the defendant's patented system; it fulfills the same functions and cannot be differentiated in principle.

27. The part of the plaintiff's system which comes into operation by invoking the use of the cut-out switch is an added embellishment which in no way denies that the plaintiff is in substance using the defendant's system. Without doing so the plaintiff's system would never start or operate at all.

28. The modifications made by the plaintiff in the defendant's system by using parallel rather than concentric re-return and suction pipes, by using a somewhat larger hood or bell at the bottom of the tank unit instead of the "bell" formed by the shorter suction pipe inside of the larger return pipe, by increasing to a small degree the contact of returning hot oil with cold oil under the hood or bell, by supplying heat in a fiber suction pipe in the tank through a rod heater instead of heating the tank unit pipes by the electric circuit, by using the cut-out switch to turn off the electric circuit heating the oil conduit pipes and heat the oil by immersion heater only while it is being pumped instead of keeping the oil conduits continuously heated by the electric circuit and by a few other minor differences, were adopted by the plaintiff with the intention and for the purpose of asserting an unreasonably narrow and restricted interpretation of the defendant's patent and then claiming noninfringement by virtue of the differences enumerated.

29. The usual presumption of validity arising from the granting of the patent in suit is strengthened in this case by the fact that patents representative of the closest prior art were considered by the Patent Office in the examination of the application on which the Lines patent in suit issued.

30. The defendant's system, as delineated and described in the Lines patent, discloses a new combination of known elements producing a new method of operation and a new and beneficial result.

31. The plaintiff from its beginning knew of the defendant's patent and sold the parts and instruction drawings which taught the system; and its companion corporation has sold and installed the infringing system.

32. The defendant gave written notice of infringement to the plaintiff and warned the plaintiff and its customers that legal action would be instituted against them if unauthorized use was made of the patented system.

33. Although the defendant offered to license the plaintiff for a substantial geographic area around the plaintiff's place of business, it has actually issued no written licenses under the patent in suit.

34. Defendant's President Purdue threatened John A. Powell of the Conditioning Company, Inc., of Newark, New Jersey, a contractor, with litigation under the Lines patent in suit of Powell purchased the unpatented parts of plaintiff and installed them in accordance with the system taught by the Lines patent in fuel oil heating systems for certain public schools in Newark.

35. Paul Schmidt of Fluid Systems of New York, wholly owned subsidiary of defendant, threatened the contractor Fred Wendel of Paramus, New Jersey with litigation under the Lines patent in suit if the contractor purchased the unpatented parts of plaintiff and installed them in accordance with the system taught by the Lines patent in a fuel oil heating system in Northern Valley Regional High School.

36. The defendant had no intention of preventing nor did it in fact prevent the sale of the separate unpatented parts or items for uses outside of the defendant's patented method and system.

## Discussion

On the issue of validity the court has examined all of the claims of prior art and has compared them with the Lines patent. It has also studied the analyses of the patents relied upon by the plaintiff here and the appellant in the case of Great Lakes Equipment Co. v. Fluid Systems, Inc., 6 Cir., 217 F.2d 613, as anticipating the Lines patent and it is apparent that the Lines patent is sufficiently distinguished from them. In the present case the plaintiff also claims prior art in Martin #1983043, 1934, in a portion of a publication "Industrial Piping" (Exhibit 28), in DiBattista #1575152, 1925, and Carleton #1727585, 1927, none of which was before the Court of Appeals for the Sixth Circuit in the Great Lakes Co. case. Martin discloses suction and return pipes entering and leaving a supply tank. The ends of these pipes are within a hood inside of the tank, which runs from one side of the tank to the other. A cross-section of the tank and the hood inside of it shows that the hood takes up about one-half the horizontal distance through the tank and approximately one-fifth of the perpendicular distance. The oil or other viscous liquid under the hood is heated by an immersion heater which is also under the hood. It is obvious that a substantial amount of oil beneath the hood is heated by this immersion heater. There is disclosed no heating of the conduits by an electric circuit.

The excerpt from the publication "Industrial Piping" deals with the application of heat to oil conducting pipes to reduce viscosity in general terms. It suggests wrapping the pipes in insulation and attaching spot heaters to the line. It does not suggest or describe having an electric circuit run through the pipes themselves to supply heat. DiBattista shows a device for heating by electric current a flexible hose and nozzle to keep fluids warm while passing through the hose for spraying purposes. It has no return line and no circulation of liquid. It suggests a heating of the entire storage or supply tank which Lines is designed to avoid. Carleton discloses a device for supply tank or storage heating which Lines specifically eliminates.

Although the Lines patent combines a number of known elements, the method of operation is new and the specific result achieved is new and beneficial. The element of invention, which the prior art does not disclose, appears in the method and system whereby the excess oil returns through the heated pipes to the lower end of the return pipe in the tank unit where this hot, returning oil meets new oil in the bottom of the return pipe and with it is drawn up into the shorter suction pipe without being diffused or circulated through the mass of cold oil in the supply tank. It is, therefore, not necessary to have an immersion heater or heated coils in the tank to heat up all the oil held there in storage. Once the simplicity and economy of the invention was able to be demonstrated, it met widespread public acceptance.

While public acceptance is, of course, not by any means conclusive, it is something which may be considered. Goodyear Tire and Rubber Co. Inc., v. Ray-O-Vac, 1944, 321 U.S. 275, 278, 64 S.Ct. 593, 88 L.Ed. 721. There has been wide public acceptance of the defendant's system. It appears, however, that considerable effort had to be expended to demonstrate that it was the solution to the current need. It was not obvious to those in the business when it was first launched. Mr. Trabilcy, the president of the plaintiff, had been in the business of designing oil burner systems since 1930. He was a mechanic skilled in the art. He was aware of the problem to be solved and of the prior arts pertinent to the subject. It was not obvious to him how the old elements could be combined to produce the teaching of the Lines patent; nor even after the Lines system was launched, did he adopt it as a solution to the problem until long after it had had wide public acceptance and marked financial success.

The plaintiff urges that its system with parallel return and suction pipes, terminating in a hood or bell at the end of the tank unit, is distinguishable from the defendant's method and system. It claims a larger mixing of hot returning oil and new cold oil under the bell than in the defendant's system and argues that under the Lines patent, there can be no mixing at all of hot returning oil with new oil at the lower end of the tank unit, for if there is the slightest mixing, it is "diffused through the colder oil in the tank" and is something outside the patent. Such a narrow and restricted construction of the defendant's patent claims flies in the face of all reason. Obviously there is new oil drawn into the suction pipe with the returning hot oil and the Lines patent makes this perfectly clear and no other interpretation of the patent is possible. The fact that the plaintiff's system may produce a slightly larger degree of mixing of the hot returning oil and of the cold new oil under the bell does not show the use of any other principle than that of the Lines patent. Neither this feature nor other changes and added embellishments made by the plaintiff in adopting the defendant's method and system saves it from infringement.

" 'Authorities concur that the substantial equivalent of a thing, in the sense of the patent law, is the same as the thing itself; so that if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form or shape.' Union Paper Bag Machine Company v. Murphy, 97 U.S. 120, 125, 24 L.Ed. 935. * * * A close copy which seeks to use the substance of the invention, and, although showing some change in form and position, uses substantially the same devices, performing precisely the same offices with no change in principle, constitutes an infringement. Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147.

"What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum. It does not require complete identity for every purpose and in every respect. * * * " Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, at page 609, 70 S.Ct. 854, 856, 94 L.Ed. 1097.

This case is distinguishable from Great A. & P. Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 130, 95 L.Ed. 162. The result of the combination of old elements as used in the defendant's system in the present case is an additional and different function from that produced by the elements outside of this particular combination. Here "two and two have been added together" and they produce something more than four. There is, moreover, nothing here to indicate that the defendant has made up an aggregation of old elements and "obviously withdraws what

already is known into the field of its monopoly and diminishes the resources available to skillful men."

The defendant's efforts to dissuade the plaintiff and the plaintiff's potential customers from using the Lines system and advising them that the matter would be litigated if they persisted in doing so, did not go beyond the use of proper means to protect its patent rights. There was no violation of the anti-trust laws or any unfair trade practice.

## Conclusions

1. The court has jurisdiction of the subject matter and the parties in this action.

2. The defendant's patent, as to claims 4, 14 and 15 here in issue, is valid.

3. The plaintiff has infringed Patent #2,224,403 owned by the defendant.

4. The defendant has not violated the anti-trust laws nor has it engaged in unfair competition.

5. The plaintiff's complaint is dismissed.

6. Judgment may enter for the defendant on its counterclaims to have an accounting for damages suffered and its costs, and for a permanent injunction against the plaintiff and all those in privity with it from further infringing Patent #2,224,403.

### On Motion for New Trial

As for the motion for a new trial, I am not satisfied that the plaintiff in the exercise of due diligence, could not have found Norton, Patent No. 1,492,742 prior to or during the course of the trial of the case and that it similarly could have discovered the publication "Enterprise Burners".

Moreover, it is not likely that either or both would change the result reached in the first trial. They are distinguishable from the Lines patent in that they each call for the use of a submerged oil preheater and neither heats the oil in the pipes by running an electric current through the conduits.

The motion for a new trial is denied.