**ELECTRIC PIPE LINE, Inc., Plaintiff,**

v.

**FLUID SYSTEMS, Incorporated, Defendant.**

**No. 4802.**

United States District Court
D. Connecticut, Civil Division.

Dec. 4, 1956.

James E. Nolan, Strauch, Nolan & Diggins, Washington, D. C., for plaintiff.

Rockwell & Bartholow, New Haven, Conn., for defendant.

ANDERSON, District Judge.

On October 15, 1956, the Special Master in compliance with the order appointing him reported on the damage sustained by the defendant for the plaintiff's infringement of the defendant's patent No. 2,224,403 as decided by this court, 132 F.Supp. 123, affirmed in 2 Cir., 231 F.2d 370; and on the question of whether five modified systems, developed by the plaintiff since said decision, infringed the patent in question.

■ With regard to the findings and conclusions of the Special Master on the issue of damage, the plaintiff bases its objections generally on its claims that there is insufficient evidence to support lost sales as a measure of patentee's damages. I find the contrary to be so. Evidence was adduced as to the percentage of Fluid Systems' gross sales that was profit; and the Master's finding that Fluid Systems could have supplied purchasers with systems equivalent to those sold by Electric Pipe Line was reasonable. The defendant, patentee, was actually exploiting its invention as a close monopoly by manufacturing and sales activity in the same areas as the plaintiff, infringer. The Master resolved conflicting evidence in finding that Fluid Systems and Electric Pipe Line were the only sellers of the kind of system required by the specifications of the jobs in question. On the basis of these findings and because of the substantial nature of the building projects of which these fuel storage and transportation systems were only a part, it was reasonable for the Master to conclude that save for infringer's activity the purchasers would have bought from patentee rather than doing without or using some other method. See 3 Walker on Patents 2164 (1937 Ed.); W. S. Godwin Co. v. International Steel Tie Co., 6 Cir., 29 F.2d 476. And because there were only two suppliers, this is true whether the patentee formally bid on the job or not. See Klooster, Patent Accountings 463; Continuous Glass Press Co. v. Schmertz Wire Glass Co., 3 Cir., 219 F. 199, 206.

■ The plaintiff also claims that the patentee's damages should not include lost sales of parts of the system, immersion heaters for example, not covered by the patent. It is clear that purchasers would buy the whole works from one supplier, either infringer or patentee. But plaintiff claims that even so, patentee's damages for infringement do not extend to these non-disclosed items. There is a rule that the patentee of an improvement to an existing device must apportion his damages so as to include only the improvement. Dowagiac Manufacturing Co. v. Minnesota Moline Plow Co., 235 U.S. 641, 35 S.Ct. 221, 59 L.Ed. 398; Garretson v. Clark, 111 U.S. 120, 4 S.Ct. 291, 28 L.Ed. 371. But this rule and the cases based on it are not applicable here. The facts and circumstances of

this case come under the rule that where the entire marketable value of the thing sold is dependent on the patent, its entire value is included in computing infringement damages. Westinghouse Elec. & Mfg. Co. v. Wagner, 225 U.S. 604, 614, 32 S.Ct. 691, 56 L.Ed. 1222; Garretson v. Clark, 111 U.S. 120, 4 S.Ct. 291; Klooster, Patent Accountings, Chapter LXII, Entire Market Value Rule. The test is not whether, with the patent-disclosed features stripped away from the whole device, there would remain certain items such as the immersion heater which would be marketable somewhere in the world; but whether, in the particular market whose demand the infringer met—such as the public schools, Y.M. C.A., housing development, etc.—there was a market for such an item as the immersion heater separate and detached from the invention. The answer is no. Even though the immersion heater was an added embellishment outside of the patent, it could only have been sold by the plaintiff in the area of demand which it unlawfully served, in connection with and attached to the patented system. It was the patented system which sold the total device including the unpatented parts; and without the patented system there was no market for the unpatented parts among those whose demand for the patented system created the market with which the case is concerned. As the plaintiff would not have sold an immersion heater or any other unpatented attachment to these purchasers unless it had infringed the defendant's patent and as it has been found that, but for the infringement, the defendant would have sold the whole system including the unpatented parts, the plaintiff must pay for the whole profit which the defendant lost. But for Electric Pipe Line's wrongful usurpation of Fluid Systems' invention, Fluid Systems' gross sales would have increased in the amount found by the Master, and its damages are the portion of this sum that would have been profit.

With regard to the question of infringement by one or more of five modified systems recently developed by the plaintiff, it appears that systems one through four (being respectively Exhibits M-DD, M-EE, M-FF, and M-GG) differ from the original infringing system in that there is no "hood" or "bell" at the bottom of the return and suction pipes inside the fuel tank and that, although in each of the four systems the return and suction pipes are close to each other in the tank, they vary in length with respect to each other with the exception of Exhibit M-DD, the return and suction pipes of which are the same length. The effect of these minor changes is to increase to some degree the contact of returning hot oil with the cold oil in the tank under the return and suction pipes and upward in the area around these pipes. They still constitute no more than minor differences between the defendant's patented system and the systems shown in Exhibits M-DD, M-EE, M-FF and M-GG. They still make full use of the method and system invented by Lines and, as stated in Finding 28 of the former decision by this court, are adopted by the plaintiff with the intention and for the purpose of asserting an unreasonably narrow and restricted interpretation of the defendant's patent and then claiming noninfringement by virtue of the differences enumerated. The claims as to systems shown in Exhibit M-DD through M-GG are simply a reiteration of the old claim by the plaintiff that if there is the slightest mixing of the returning hot oil with the cold oil in the tank, it is "diffused through the colder oil in the tank" and is therefore something outside of the patent and there is no infringement. The value in the defendant's patented system rests upon the fact that the viscosity of the fuel being taken up in the suction pipe and conducted to the burner is reduced and made flowable without the necessity of reducing the viscosity of all or a substantial quantity of the oil in the tank. The plaintiff in these four systems makes full use of the method and system disclosed by the defendant's patent but by changing the arrangement of return and suction pipes

renders the method and system somewhat less efficient and on the basis of this claims immunity from infringement. The plaintiff, to no useful end, has increased the degree of diffusion over the diffusion which occurred in its original infringing design and renews its argument that the defendant's patent permits of no diffusion whatever and concludes that now that it, the plaintiff, has provided additional diffusion around the area of the tank unit, it has thoroughly distinguished its new offerings from the patented system. But they obviously could not function at all without making full use of the substance of the defendant's patented invention.

The plaintiff has offered a fifth newly developed system (Exhibit HH) the distinguishing characteristic of which is that there is no return pipe running into the fuel tank but only a suction pipe with a rod heater in it. The suction pipe is joined to the return pipe at a T-joint six inches above and twelve inches laterally distant from the suction stub at the top of the tank. The fuel is heated by the rod heater in the suction stub to about 80° F and is pumped up to meet and merge with returning hot oil of 180° F at the T-joint. The meeting and mixing of the returning hot oil with the oil in the suction pipe takes place, therefore, not at the mouth of the suction pipe or in an area just beneath it, but at the T-joint about eighteen inches distant from the top of the tank. The plaintiff has plucked out of the patent and out of this court's opinion in the original decision the phrase "in the tank" where it is used in connection with the mixing of the hot return oil with the cooler oil and by changing the position of the point of mixture to a place outside of the tank now asserts that its offering in Exhibit HH is distinguishable from the patented method and system and is not an infringement. This change in position and form does not prevent the system therein described from being "substantially the same device, performing the same offices with no change in principle." Without making full use of the defendant's invention in moving the oil through electrically heated conduits and merging the hot excess return oil with cooler oil from the tank without diffusing the hot return oil through the mass of cold oil in the tank, the plaintiff's system would not function.

The following corrections to the Master's report may be made:

(a) In Finding 43 of the Master's report on damages, the amount should be $22,538.43 and the last sentence of the report is amended to recite the damages as $22,538.43.

(b) In Finding 39 of the Master's report on infringement, the distance mentioned should be eighteen inches instead of twelve inches.

(c) Finding 18 of the Master's report on damages is amended to read as follows: The defendant bid on the substantial majority of the installations set forth in Schedule A, and made estimates on the remainder of the Schedule A installations.

(d) Finding 19 of the Master's report on damages is amended to read as follows: Its price for those installations would have been $45,363.

(e) Finding 23 of the Master's report on damages is amended by the addition of the following: This conclusion takes into account the fact that certain jobs on Schedule B carried specifications drawn in such a way that only the infringer's system literally conformed with them, but this finding nevertheless follows from the finding (No. 27) that purchasers wanted and installed the patented system, the basic finding of infringement, and the finding (No. 26) that plaintiff and defendant were the only two suppliers using the patented system in the area of installation.

Except for these corrections, it is ordered:

(1) That each and every objection to the Master's reports, filed October 15, 1956, raised by the plaintiff or the defendant is overruled.

(2) That the said reports are confirmed in all other respects and the find-

**266**

ings of fact and conclusions of the Master are hereby adopted as the findings of fact and conclusions of law of the court.

Judgment for the defendant against the plaintiff may be entered in the amount of $22,538.43 with interest and costs.

The plaintiff is enjoined from selling or otherwise practicing the systems and methods shown in Exhibits M-DD, M-EE, M-FF, M-GG and M-HH.