VELO–BIND, INCORPORATED, a California Corporation, Plaintiff-Appellant,

v.

MINNESOTA MINING & MANUFACTURING COMPANY, a corporation; 3M Business Products Sales, Inc., a corporation; Ro-Bind Corporation, a corporation; Rally Industries, a corporation; and Joe D. Giulie, Defendants-Appellees.

VELO–BIND, INCORPORATED, a California Corporation, Plaintiff-Appellee,

v.

MINNESOTA MINING & MANUFACTURING COMPANY, a corporation; 3M Business Products Sales, Inc., a corporation; Ro-Bind Corporation, a corporation, and Rally Industries, a corporation, Defendants-Appellants.

VELO–BIND, INCORPORATED, a California Corporation, Plaintiff-Appellee,

v.

MINNESOTA MINING & MANUFACTURING COMPANY, a corporation; and 3M Business Products Sales, Inc., a corporation, Defendants-Appellants.

Nos. 79–3338, 79–4448 and 79–4584.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 8, 1980.

Decided June 8, 1981.

Rehearings Denied July 14, 1981.

James K. Haynes, Orrick, Herrington & Sutcliffe, San Francisco, Cal. (argued), for Velo Bind; Julian Caplan, Gregg, Caplan & Higgins, Menlo Park, Cal., on brief.

Carl Hoppe, Eckhoff, Hoppe, Slick, Mitchell & Anderson, San Francisco, Cal., Stanley G. DeLaHunt, St. Paul, Minn., for Minnesota Mining.

Before DUNIWAY, SNEED and POOLE, Circuit Judges.

DUNIWAY, Circuit Judge:

In No. 79–4448 appellants (hereinafter 3M) appeal from the district court's judgment, entered following a jury trial, finding that the 3M Model 1000 binding machine infringes three valid patents owned by Velo-Bind, awarding damages to Velo-Bind of $3,934,333 plus interest, and permanently enjoining 3M from infringing the patents. We affirm in part and reverse in part.

In No. 79–4584 3M further appeals from the district court's refusal to modify the injunction so as to specifically exempt 3M's proposed 1000DA binding machine from its terms. We affirm.

In No. 79–3338 Velo-Bind cross-appeals from the district court's refusal to award treble damages and attorney's fees. We affirm.

## I. *Facts.*

In 1966, William Abildgaard and Charles Groswith formed what is now Velo-Bind for the purpose of inventing a new system of binding books and documents. After several false starts, they succeeded in 1968 in inventing a strip binding machine. Simply stated, this machine forms a bind by placing on either side of the pages to be bound, and then compressing, a male plastic strip with nail-like studs and a female plastic strip with holes corresponding to the studs.

The machine which Velo-Bind eventually developed for sale joins the two strips to form a lasting bind through the use of a "hot knife" process. In this process, once the strips are pressed together with the studs from the male strip projecting through the holes in the female strip, a hot knife or shear cuts off the excess length of the studs leaving heat softened stud ends. These malleable ends are then deformed into rivets by the striking action of heading arms. The rivet heads quickly cool creating a permanent bind.

Desiring to manufacture and market its invention but short of capital, Velo-Bind entered into negotiations with 3M in 1971. When these negotiations ended without an agreement, Velo-Bind proceeded on its own, eventually manufacturing several models of its by then patented strip binder, all of which employed the hot knife system.

3M also proceeded on its own. In 1975, 3M began selling its Model 1000 binding machine. Although a strip binding machine similar in structure to Velo-Bind's, 3M's machine forms its bind by means of ratchet teeth on the studs of the male strip, engaged and held in place by friction-locking blocks in the female strip. Thus there is no need to heat the stud ends in order to form rivets, and the excess length of the studs is removed by a cold knife.

Velo-Bind brought suit claiming infringement of three of its patents—claims 1, 2, and 3 of patent No. 3,608,117 for Machine for Binding and Punching Sheets (hereinafter the '117 patent); claims 1 and 7 of patent No. 3,756,625 for Method and Apparatus for Binding Books (hereinafter the '625 patent); and the design patented in patent No. DES 227,195 for Machine for Binding Books (hereinafter design '195). Because claims 2 and 3 of the '117 patent and claim 7 of the '625 patent are dependent upon claim 1 of their respective patents, and because the design patent concerns only the outward appearance of the machine and only $250 in damages, the two claim 1's became the focus of the litigation.

At trial Velo-Bind presented extensive testimony by an expert witness, Harris Zimmerman. 3M did not counter with an expert of its own, nor did it challenge Zimmerman's qualifications. The jury found that each patent claim in issue was both valid and infringed, and awarded damages to Velo-Bind that included not only lost profit on the sale of the machines but also lost profit on the sale of unpatented paper, plastic strips, and book covers. The district court refused to overturn this verdict and further enjoined 3M from future infringements, without exception for 3M's proposed 1000DA model.

In these appeals 3M argues as a matter of law that there was no infringement, that Velo-Bind's patents are invalid, that the jury's damage measure was improper, and that 3M was entitled to a ruling that its proposed Model 1000DA did not infringe

Velo-Bind's '117 and '625 patents. Velo-Bind cross-appeals from denial of treble damages and attorney's fees.

## II. *Infringement.*

3M argues that its Model 1000 does not infringe Velo-Bind's patent claims as a matter of law, and thus that it was entitled to a judgment in its favor. The gist of 3M's argument is that when properly construed, Velo-Bind's mechanical patent claims refer only to a machine employing the hot-knife process. We disagree.

Claim 1 of the '117 patent describes a strip binding machine as follows:

Apparatus for binding sheets together with the use of a first strip, a plurality of studs projecting from and spaced longitudinally relative to said first strip and a second strip formed with apertures spaced longitudinally of said second strip at intervals complementary to said studs, said apparatus comprising a frame having means shaped to receive one said strip, a platen table adjacent said means to support apertured sheets, a pressure foot formed to engage the other of said strips, cooperating means on said frame and said pressure foot to move said pressure foot toward said first-mentioned means to bring said strips together with said studs projecting through said apertures, and shear means to cut off the ends of said studs projecting through said second strip.

Claim 1 of the '625 patent is much the same although it refers to a "cutting means" instead of a "shear means" to cut off the stud ends.

Recognizing that the literal language of either claim 1 covers its Model 1000, 3M seeks to limit the claims by reading into them both a hot knife and the hot knife binding process. 3M correctly argues that the use of "means" terminology brings into play 35 U.S.C. § 112. Under this section where a claim uses "means" language, "such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 3M argues that since the specifications must be referred to, and since they describe a hot knife or shear, each claim 1 must therefore be read to include a hot knife and the hot knife binding process thus excluding 3M's cold knife machine from its terms.

In making this argument 3M looks only to one part of the specifications—the general description of the hot knife process preceding the claims. The claims themselves, however, are also part of the specifications. 35 U.S.C. § 112. And looking to the other claims, including those not at issue, it appears that by "shear means" or "cutting means" neither claim 1 refers only to a heated knife. For example, claim 4 of the '117 patent refers to "a plurality of blades ... *and heating means* to heat said blades." (emphasis added). Claim 9 of the same patent describes an "[a]pparatus ... which *further* comprises *heating means* to heat said shear means...." (emphasis added). In view of the other claims in the two patents, it appears both that the failure of either claim 1 to specify a hot knife was deliberate and that in any event a "shear means" or "cutting means" and a "heating means" are different structures.

More importantly, 3M's argument of non-infringement assumes that *if,* by "shear means" or "cutting means" and the application of section 112, claim 1 of either patent must have reference to a hot knife, then it must also be understood to refer only to the hot knife *binding process.* Such an assumption is unwarranted. Neither claim 1 makes any reference to the hot knife binding process, and the description of this process in the specifications does not limit the claims. *Smith v. Snow,* 1935, 294 U.S. 1, 11, 55 S.Ct. 279, 283, 79 L.Ed. 721, ("the claims of the patent, not its specifications, measure the invention.").

Moreover, this assumption finds no support in section 112, which requires only that shear or cutting "means" be construed in light of the *"corresponding* structure, material or acts" in the specifications; it does not require that the claim be further limited to the description in the specifications. Nor can it be argued that the hot knife binding process—as opposed to a hot

knife—is the "corresponding structure material or acts" of the shear or cutting means referred to in the claims. The shear or cutting means, whether hot or cold, function simply to cut off the stud ends. The process of creating a permanent bind, whether by friction fit strips, ratchet teeth on the male studs, or formation of rivet heads, is a separate matter. 3M showed as much in its cross-examination of Zimmerman:

> Q. ... Now, what is the function which the shear means provides in the patented machine?
>
> A. The function is to enable the machine to accommodate the different thicknesses of bound volumes.
>
> Q. And the function is to cut off the ends of the studs, is it not?
>
> A. That's correct.

Without the assumption that the hot knife and the hot knife binding process are the same, 3M's contention that "shear means" or "cutting means" refers to a hot knife is of little significance. Even if either claim 1 were understood to describe a hot knife to cut off the studs, certainly a cold knife used to perform the same function would be covered by the claim, if not literally, then under the doctrine of equivalents. *See Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co.*, 1950, 339 U.S. 605, 608–609, 70 S.Ct. 854, 856–857, 94 L.Ed. 1097. Zimmerman gave uncontradicted testimony that "anyone skilled in just about any ... mechanical art would know that if you cut something ... you do it faster, probably less noisy and less pressure required to cut with a hot blade or a hot knife. Only anyone that has the skill of any kind in the art knows that you can also cut with cold knives."

In short, because neither claim 1 is limited to the hot knife binding process, whether the knife is hot or cold is immaterial. There is infringement either way.

■ 3M makes several other arguments against a finding of infringement, none of which is convincing, First, 3M argues that Velo-Bind's advertising and other corporate statements indicate that it understood the patent and the actual invention to be limited to a hot knife binding process. Even if probative of the scope of claim 1, however, these statements were contradicted by other evidence in the record as to Velo-Bind's intention. The jury's implicit finding of fact that these corporate statements did not define the scope of Velo-Bind's invention or understanding was reasonable and was supported by substantial evidence. Moreover, an inventor's decision to manufacture and market one embodiment of his invention obviously does not limit the patent to that embodiment. *Continental Paper Bag Co. v. Eastern Paper Bag Co.*, 1908, 210 U.S. 405, 418, 28 S.Ct. 748, 751, 52 L.Ed. 1122.

Second, 3M argues that because Velo-Bind did not assert the doctrine of equivalents at trial it may not do so here. But the trial court instructed the jury on this doctrine, and in any event, "[a]n appellee may defend a judgment on any ground consistent with the record." C. Wright, Law of Federal Courts, § 104, p. 523 (3d ed.).

■ Finally, 3M argues that Velo-Bind conceded that the cold knife was not equivalent to a hot knife. 3M bases this argument on Velo-Bind's failure to charge infringement of those claims specifying a hot knife and on Groswith's testimony in which he "guessed" that Velo-Bind had not charged 3M with infringing claim 4 of the '117 patent because 3M's machine "doesn't have heating means to heat the blades." But neither of these facts amounts to a formal concession of no infringement. And even were we to agree that Velo-Bind had conceded no infringement of claims such as claim 4 of the '117 patent, it does not follow that there was no infringement of claim 1. "[A] patentee's broadest claim can be no broader than his actual invention," *Kemart Corp. v. Printing Arts Research Laboratories*, 9 Cir., 1953, 201 F.2d 624, 633, but Velo-Bind's "actual invention" included not only a machine using the hot knife *process*—e. g., claim 4—but also a machine preparing sheets for strip binding no matter how the bind was to be secured, e. g., claim 1. Thus the rule, also

stated in *Kemart Corp., supra*, "that in interpreting a series of claims, a limitation not present in one may not be implied where the same limitation appears in later claims," is applicable here.

Thus we affirm the finding of infringement of Velo-Bind's mechanical patents '117 and '625. However, we cannot accept the jury's finding of infringement of Velo-Bind's design '195. Having examined the design '195 and the infringing machine, we conclude that the designs are not so substantially the same "in the eye of an ordinary observer ... such as to deceive such an observer." *Sun Beam Lighting Co. v. Pacific Associated Lighting, Inc.*, 9 Cir., 1964, 328 F.2d 300, 301. The jury's finding to the contrary was not supported by substantial evidence.

### III. *Validity.*

■ 3M argues that Velo-Bind cannot have it both ways: If Velo-Bind's patents are interpreted to cover more than the hot knife process so as to support a finding of infringement, then these same patents must be held invalid as a matter of law. In particular, 3M argues that if claim 1 of the '117 or '625 patent covers more than the hot knife binding process disclosed in the specifications, it is invalid because it fails to meet the disclosure requirements of 35 U.S.C. § 112, or because it is anticipated by prior art under 35 U.S.C. § 102, or because it would be obvious to someone skilled in the art under 35 U.S.C. § 103.

### A. *Validity under 35 U.S.C. § 112.*

35 U.S.C. § 112 requires in relevant part that "[t]he specification shall contain a written description of the invention ... in such full ... terms as to enable any person skilled in the art ... to make and use the same.... The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 3M argues that because, when read literally and without incorporating the hot knife process, neither claim 1 describes an invention which works—that is, binds books, neither satisfies the disclosure requirements of this section.

3M's argument is without merit. There was evidence at trial that at least one method of securing a bind would be obvious to anyone skilled in the art although not specified by either claim 1. Velo-Bind produced evidence that a machine built according to claim 1 of the '117 patent could bind by use of friction fit strips—the male studs being slightly larger than the corresponding holes in the female strip. Such a machine was demonstrated at trial. In addition, Groswith gave uncontradicted testimony that "any engineer would know that parts can be joined together with friction or what is called interference fit." We take judicial notice that this is correct. The carpenter's nail is very old art indeed.

Moreover, either claim 1 may also be upheld as a subcombination patent that describes a machine which prepares pages for permanent book binding. "It has long been recognized that claims for combinations and also subcombinations may be validly allowed by the patent office ..., and that a claim need not include all the elements necessary to make up a complete operative device" (citations omitted). *Pursche v. Atlas Scraper and Engineering Co.*, 9 Cir., 1961, 300 F.2d 467, 476 (citing *Deering v. Winona Harvester Works*, 1894, 155 U.S. 286, 302, 15 S.Ct. 118, 124, 39 L.Ed. 153, ("Admitting that additional elements are necessary to render the device operative, it does not necessarily follow that the omission of these elements invalidates the claim, or *that the precise elements described in the patent as rendering it operative must be read into the claim....*" (emphasis added)).

### B. *Anticipation and Obviousness.*

3M argues that all of the elements of claim 1 of the '117 and '625 patents were anticipated by other patents, particularly by a patent for a purse making machine known as the Wurzner patent.

We have held that anticipation is a strictly technical defense. *Jones v. Vefo Inc.*, 9 Cir., 1979, 609 F.2d 409, 410. "Unless all of the same elements are found in exactly the

same situation and united in the same way to perform the identical function in a single prior art reference there is no anticipation." *Id.*, quoting *Walker v. General Motors Corp.*, 9 Cir., 1966, 362 F.2d 56, 68. Velo-Bind's expert, Zimmerman, gave extensive testimony on direct and on cross-examination differentiating Velo-Bind's patent claims from those of the Wurzner patent and of the many other patents that 3M advanced as anticipating Velo-Bind's claims. He testified, for example, that the Wurzner machine did not provide for a "pressure foot" or "pressure bar" nor for a "means shaped to receive a strip." Indeed, the district judge specifically noted in his memorandum of decision that all of 3M's contentions involving the Wurzner machine "[strain] credulity."

Similarly, we reject 3M's contention that Velo-Bind's mechanical patents—the '117 and '625 patents—were obvious and therefore invalid unless interpreted to include the hot knife binding process. Under 35 U.S.C. § 103 a patent may not be obtained "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious ... to a person having ordinary skill in the art. . . ."

In *Graham v. John Deere Co.*, 1966, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545, the Court found that application of § 103 requires several "factual inquiries" into "the scope and content of the prior art ...; differences between the prior art and the claims at issue ...; and the level of ordinary skill in the pertinent art. . . ." *Id.* at 17, 86 S.Ct. at 694. The trial court so instructed the jury, and the jury's findings of validity in answer to the court's interrogatories implicitly answered each of these factual questions. *See Control Components, Inc. v. Valtek, Inc.*, 5 Cir., 1980, 609 F.2d 763, 767; *see also Palmer v. Orthokinetics, Inc.*, 9 Cir., 1980, 611 F.2d 316, 319 (precise articulation of *Graham* analysis not necessary where trial court's opinion in context or record reveals *Graham* inquiries were made).

Although the conclusion of validity is ultimately one of law, the jury's findings of fact which underlie this legal conclusion may not be overturned on appeal if supported by substantial evidence. *See Saf-Gard Products, Inc. v. Service Parts, Inc.*, 9 Cir., 1976, 532 F.2d 1266, 1272, *cert. denied*, 1976, 429 U.S. 896, 97 S.Ct. 258, 50 L.Ed.2d 179 (the trier of facts' "*Graham* findings are binding on appeal if not clearly erroneous"). And after reviewing the record before us we find ample support for the jury's conclusion that Velo-Bind's mechanical patents were not obvious. Velo-Bind's expert witness contrasted Velo-Bind's claims with prior art in some detail, and gave his opinion that Velo-Bind's claims were not obvious to a person of ordinary skill in the art. His opinion was buttressed by other evidence in the record, particularly that relating to the brief history of strip binding. This history was one of "long felt but unsolved needs," failed efforts by both Abilgaard and 3M, and finally a commercially successful breakthrough. *See Graham v. John Deere Co., supra*, 383 U.S. at 17–18, 86 S.Ct. at 693–694.

Indeed, so convincing is this evidence that even if we must test Velo-Bind's patents under the more rigid scrutiny given to combination patents, *see Penn International Industries v. Pennington Corp.*, 9 Cir., 1978, 583 F.2d 1078, 1081–82, we reach the same conclusion of non-obviousness. The evidence in the record indicates that Velo-Bind's patents produced an unusual or surprising—synergistic—result. *See Speed Shore Corp. v. Denda*, 9 Cir., 1979, 605 F.2d 469, 471; *Kamei-Autokomfort v. Eurasian Automotive Products*, 9 Cir., 1977, 553 F.2d 603, 608.

We therefore conclude that the jury's implicit factual determinations under *Graham* were supported by substantial evidence; the district court's refusal to overturn the jury's finding of validity was not in error. However, because we have found that Velo-Bind's design patent was not infringed, it was error for the district court to enter any judgment as to the validity of this patent. *Mobil Oil Corporation v. Filtrol Corporation*, 9 Cir., 1974, 501 F.2d 282, 293–4.

#### IV. *Damages.*

35 U.S.C. § 284 provides in relevant part that "the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." Velo-Bind requested and the jury awarded $3,934,333 in damages. Although the jury did not specify the components of this award, as we read the record, Velo-Bind gave evidence on damages as follows: $645,578 for lost profits on the patented machines including lost sales of machines as well as lost profits on machines that were sold at low prices because of competition with 3M's machines; $268,000 in added costs caused by rushing Model 123 into competition with 3M's machine; and $3,020,725 to compensate for projected lost profits over the eight-year life of a machine on sales of unpatented paper, plastic strips, and book and document covers used in making books. The latter figure includes $415,150 arising from forbearance from price increases on strips which were actually sold because of 3M's competition.

3M first argues that those damages based on lost sales of unpatented supplies should not have been awarded as a matter of law. We agree. As Velo-Bind's damage request indicates, Velo-Bind derives the vast bulk of its profits not from the sale of its machine but from the sale of unpatented supplies used in strip binding—paper, plastic strips and book covers. Velo-Bind argues that although it does not unlawfully tie the sale of these unpatented supplies to the sale of its machine, as a matter of commercial reality such supply sales do in fact follow upon the sale of a machine. Velo-Bind urges that if it has provided the jury with adequate evidence that these supply sales would have been made, it must be awarded damages for lost supply sales profits under the statute if it is to be fully "compensate[d] for the infringement." (§ 284).

We hold, however, that damages for lost profits on sales of unpatented, consumable supplies are not contemplated by the patent law. As in so much of patent law, we observe here the tension between the law's desire to protect the patentee and its desire to preserve competition.

To begin with, we find Velo-Bind's position anomalous. It concedes that it may not tie the sale of unpatented supplies to the sale of machines. To do so would violate the antitrust laws, e. g., *International Salt Co. v. United States*, 1947, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20; *Rex Chainbelt, Inc. v. Harco Products, Inc.*, 9 Cir., 1975, 512 F.2d 993, 1000–1003. It would also be a misuse of the patent, precluding its enforcement, e. g., *Leitch Mfg. Co. v. Barber Co.*, 1938, 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371; *Rex Chainbelt, Inc., supra.* Yet Velo-Bind's claim for damages comes close to asking the court to give de facto recognition to a tieing relationship which would be illegal.

Velo-Bind also admits that if 3M had deprived Velo-Bind of virtually all of its profits by simply selling strips, paper, and covers to Velo-Bind's customers, without selling the infringing machine, Velo-Bind would have had no claim for relief under the patent laws. Yet Velo-Bind's request for damages is very similar.

The singularity of Velo-Bind's request is further highlighted by examination of the case law it relies upon for support. Velo-Bind argues that cases applying the "entire market value rule" support its position. *American Safety Table Co. v. Schreiber*, 2 Cir., 1969, 415 F.2d 373, 377, quoting *Electric Pipe Line, Inc. v. Fluid Systems, Inc.*, D.C.Conn., 1956, 146 F.Supp. 262, 264, states the rule: "where the entire marketable value of the thing sold is dependent on the patent, its entire value is included in computing infringement damages." *See also* 8 Walker, Patents (Deller ed. 1973) § 775. But in none of the cases that Velo-Bind cites has the entire market value rule been applied so as to permit recovery of damages for projected lost sales of consumable, unpatented supplies upon which a patented machine works.

In *American Safety Table, supra,* the court permitted recovery of lost profits

from an unpatented table on which a patented die assembly was placed. *But see* Judge Hays' dissenting opinion, *id.* at 383. The court adopted the district court's summary of the set of facts that permitted recovery of this damage element: "... defendants' infringing sales of machines and assemblies created the market for the sale of tables separate from assemblies. *This situation is thus analogous to that where tables are sold as parts of complete machines." Id.* at 377 (emphasis added). *Paper Converting Machine Co., Inc. v. FMC Corp.*, E.D.Wis., 1977, 432 F.Supp. 907, 913, is similarly distinguishable. *Electric Pipe Line, Inc. v. Fluid Systems*, 2 Cir., 1957, 250 F.2d 697, awarded damages for infringement of a *process* patent, including lost sales of unpatented component parts of the system. But again the court was not awarding damages for consumable supplies but for the components of a single assembly.

Finally, Velo-Bind relies upon *Leesona Corp. v. United States*, Ct.Cl., 1979, 599 F.2d 958. There, the patent at issue was for a rechargeable battery, and the court awarded damages that included lost sales of unpatented anodes, cathodes, and covers used with the battery. Even so, the court made clear that it did not view these items as supplies but rather as part of a single package.

These cases do not support Velo-Bind's proposition that damages ought to be awarded for lost sales of unpatented, consumable supplies. Indeed, the one case most clearly on point, *Autographic Register Co. v. Sturgis Register Co.*, 6 Cir., 1940, 110 F.2d 883, 884–885, holds that such damages should not be awarded. In *Autographic Register* the court held that a patentee could not recover damages for lost sales of paper slips designed to be used in a patented register. As in the case here, the patentee derived most of his profit from the sale of unpatented supplies and very little from the sale of the machine. The court concluded, however, that this fact was immaterial and that the patent simply did not cover "perishable and consumable goods" used in the machine. *See also Union Car-*

bide Corp. v. Graver Tank & Mfg. Co., 7 Cir., 1960, 282 F.2d 653, 664.

Our view that damages for unpatented supplies should not be awarded is supported by several additional considerations. First, although courts have applied the entire market value rule in certain limited circumstances, this rule is itself an exception to the more general rule that, where the patent creates only part of the profits, damages are limited to that part of the profits, which must be apportioned as between those created by the patent and those not so created. *See Westinghouse Electric & Mfg. Co. v. Wagner Electric & Mfg. Co.*, 1912, 225, U.S. 604, 614–15, 32 S.Ct. 691, 694, 56 L.Ed. 1222. The damages sustained by Velo-Bind are easily apportioned between patented and unpatented lost sales.

Second, there are many elements of damage which may be caused by an infringement and yet which are unrecoverable as a matter of law. Indirect consequential damages are not recoverable, Walker, *supra*, § 755, and lost supply sales would appear to be a similar sort of damage particularly because Velo-Bind's claim is based on projected sales.

Third, damages based on projected supply sales over an eight year period must be highly speculative. Despite testimony by Velo-Bind's witnesses as to estimated sales, the effect of our decision today must render Velo-Bind's projections uncertain. Those who continue to use the 3M machine may be subject to suit for infringement; those who supply or maintain them may be subject to suit for contributory infringement.

Finally, we do not think that *Dawson Chemical Co. v. Rohm & Haas Co.*, 1980, 448 U.S. 176, 100 S.Ct. 2601, 65 L.Ed.2d 696, affects the decision in this case. In *Dawson* the holder of a process patent on a chemical herbicide sued other manufacturers of the chemical used in the process for contributory infringement under 35 U.S.C. § 271. Emphasizing that the chemical was not a staple product under section 271(c), the Court held that the patentee might maintain the suit even though the chemical itself

was unpatented and the company refused to license others to sell it.

Although *Dawson* extends some patent protection to unpatented supplies, it does so only in the particular context of a process patent, an action for contributory infringement under a specific statutory section, and a commodity conceded to be a non-staple product under the section. In light of the Court's traditional concern that protection of a patented invention be strictly limited to the invention, we do not view the opinion in *Dawson* as establishing a rule that damages for unpatented consumable supplies may be collected in suits for direct infringement of a mechanical patent.

Accordingly, we reverse the district court's award of damages for lost profits on sales of unpatented supplies and for infringement of design '195. However, we do not accept 3M's further contention that the other elements of damages in the award must be overturned for lack of sufficient evidence. Velo-Bind's witnesses—primarily officers of the Company—testified at length as to lost sales and profits on the patented machines caused by the infringement as well as to the added costs incurred in rushing Model 123 into competition against 3M's machine. 3M did little at trial to discredit their testimony or to offer contradictory testimony of its own.

Moreover, the estimate that Velo-Bind would have made three of every four 3M sales was not unreasonable, perhaps was even conservative, in light of the admitted fact that strip binding machines appeal to much the same market. Velo-Bind's witnesses gave considerable testimony as to how they reached the three of four figure and as to the factors they had considered. For example, they had taken into account 3M's name, luck, differences in pricing, competition from other companies, and effectiveness of sales personnel. As to the remaining elements of damage, Groswith testified about the nature of the additional costs incurred from rushing production of the Model 123, while 3M's own witness gave testimony tending to support Velo-Bind's claim that it could have raised the price of its machines but for 3M's competition.

■ Damages "are not rendered speculative or conjectural merely because they cannot be calculated with mathematical exactness." *Marquis v. Chrysler Corp.*, 9 Cir., 1978, 577 F.2d 624, 638, quoting *Loew's, Inc. v. Cinema Amusements*, 10 Cir., 1954, 210 F.2d 86, 95. The jury was fully capable of evaluating the evidence put before it. The district court did not err in refusing to overturn the verdict as to these elements of damage.

### V. *Modification of the Injunction—No. 79–4584.*

■ 3M moved the district court to modify its injunction against further infringement by 3M "to provide that the manufacture, use and sale of a binding machine which 3M has designed as the Model No. 1000DA ... does not constitute an infringement of either of the two mechanical patents in suit." The district court denied the motion expressing "reluctance to engage in a summary procedure of this nature" as well as uncertainty "that the Model 1000DA does not infringe the mechanical patents in question."

We believe that the district court was correct in refusing to accept 3M's proposed modification. 3M's request was less one for clarification or modification than one for a summary adjudication of an infringement claim. In refusing the request for modification, the court below relied upon *Atiyeh v. Filtex Corporation*, S.D.Cal., 1955, 130 F.Supp. 196, in which a virtually identical request for modification was made by a patent infringer. There the court found that the request was in essence a disguised action for a declaratory judgment: "Yet, rather than taking the form of an action for declaratory relief, defendant has chosen to present the matter by this summary method. One function of the declaratory judgment act was to afford relief against the peril and insecurity of defying an injunction decree in a patent suit.... [The defendant's] method would ... seem to circumvent the patentee's right to a trial of the fact issues by a jury." *Id.* at 197 (citations

omitted). We agree with this reasoning and with the district court's refusal to engage in "a supplemental summary proceeding in a former patent infringement case." *Id.* at 198.

Moreover, although its position is not entirely clear, 3M appears to argue either that its request for modification was taken under Rule 62(c), F.R.Civ.P., or as an appeal to the district court's inherent authority to modify its injunctions. Under either theory the request appeals to the discretion of the district court. See Rule 62(c), F.R.Civ.P. ("the court in its discretion may . . . modify . . . an injunction during the pendency of the appeal . . ."); *Regal Knitwear Co. v. NLRB*, 1945, 324 U.S. 9, 15, 65 S.Ct. 478, 482, 89 L.Ed. 661 (". . . such relief would be in the sound discretion of the court . . ."). The district court's refusal to grant 3M's request for relief amounting to the summary adjudication of a separate and prospective act of infringement was not an abuse of its discretion.

We need not and do not express any opinion as to whether the proposed machine infringes any of Velo-Bind's claims.

### VI. *Treble Damages and Attorneys' Fees—No. 79–3338.*

■ Velo-Bind cross-appeals from the district court's refusal to increase the damages as provided by 35 U.S.C. § 284—"the court *may* increase the damages up to three times the amount found or assessed" (emphasis added)—or to award attorneys' fees as provided by 35 U.S.C. § 284—"the court in exceptional cases *may* award reasonable attorney fees to the prevailing party." (emphasis added).

Velo-Bind argues, as it must, that the district court's refusal to award these additional sums was an abuse of its discretion. We find no such abuse. The questions of patent validity and infringement in this case are complex and close. The district court's conclusion that 3M's conduct was not so egregious or exceptional as to compel additional damages or attorneys' fees was a proper exercise of its discretion. *See Troy Company v. Products Research Company*, 9 Cir., 1964, 339 F.2d 364, 367–68.

In No. 79–3338 and No. 79–4584 the judgment is affirmed. In No. 79–4448 the judgment is reversed in part and affirmed in part and the matter is remanded for further proceedings consistent with this opinion, either by granting a new trial on the issue of damages or by granting a new trial subject to a remittitur of the amount of damages attributable to lost profits upon sales of unpatented paper, plastic strips and covers and for infringement of design '195.

POOLE, Circuit Judge, dissenting, in part, and concurring, in part:

The majority's resolution of the infringement-validity problems of this case has a certain neat appeal, particularly since a jury has already passed on some of the underlying issues. Respectfully I must nonetheless dissent. I do so because after applying my own best analysis, I cannot agree that 3–M's binding machine does in fact infringe Velo-Bind's patent unless one gives those claims interpretation so broad that they would be invalid.

A patent presupposes an invention or discovery (35 U.S.C. § 100(a)), and may only be obtained for a "new and useful process, machine, * * * or any new and useful improvement thereof, * * *." 35 U.S.C. § 101. Velo-Bind's primary claims describe a means of securing and inserting plastic pins contained in one strip into complementary holes in an opposing strip. This type of fastening is not by itself new and would not entitle Velo-Bind to a patent. The majority opinion describes the alternate methods of securing such pins in the manner of a ratchet (which is what the 3–M machine does); by the familiar carpenter's practice of driving a tapered nail (which would not be patentable); or by fashioning a rivet head to secure the pins once they have been inserted. The latter is what the Velo-Bind patents do and they do it by the heated knife process. Therein lies the heart of the matter for without some type of heat the rivet head could not be fashioned and Velo-Bind's patent would not work except by one of the other methods.

Velo-Bind's primary claims are said to deal with shearing the pins after insertion. This alone is neither remarkable or patentable. But the specifications leave in no doubt the fact that the machine is designed not only to cut the excess pins after they have entered the opposing strip, but to soften them and then by force to hammer them into the rivet heads which hold the bound material together. Fashioning these rivet heads is not simply cosmetic; it is the essential aspect of the Velo-Bind machine. By contrast, use of ratchet pins is the essential element of the 3–M machine. 3–M's binding process is complete when the ratchet pins have been inserted and locked. Unlike Velo-Bind's device, it does not require a rivet head for security.

Under 35 U.S.C. § 112, the specifications describe the invention, the manner and process of making and using it, and are required to do so in "such full, clear, concise and exact terms as to enable any person skilled in the art * * * to make use of the same, and [to] set forth the best mode contemplated by the investor for carrying out his invention." Noting that by the use of "means" terminology "a claim shall be construed to cover the corresponding structure, material or acts described in the specifications and equivalents thereof," (Op., p. 968), the majority avoids the logical conclusion that in this case claims-plus-specifications establish the indispensability of some heating element. It states that Velo-Bind's claims merely relate to differential "shear means." It bolsters this position by reliance upon the testimony of Zimmerman, Velo-Bind's witness, to the effect that the "shear means" function, hot or cold, operates simply to cut off the stud ends. (Op., p. 969) I find this testimony unacceptable in the face of the fact that when the actual claims here are read in the light of the specifications it is clear that the heating element is what makes this invention work.

If on the other hand, the patents, claims and specifications are held to embrace *any* mechanism which joins plastic strips by pins

and then cuts off the excess length of the pins, there would be nothing to "attain the degree of novelty necessary to establish non-obviousness in the case of a combination." *Lawrence v. The Gillette Company, et al.,* 603 F.2d 68 (9th Cir. 1979). Nor should we look to the claims alone in order to decide infringement, and then look to the claims in the light of their specifications in deciding validity. This court said in *Wire Tie Machinery Co., et al. v. Pacific Box Corp.,* 107 F.2d 54 (9th Cir. 1939):

Appellant cannot be permitted to construe his claims with reference to his drawings and specifications in order to escape invalidity, and then in the next breath seek to disregard the drawings and specifications in order to spell infringement.

107 F.2d at 55.

The testimony of Zimmerman upon which the majority places reliance, asserted that the function of the "shear means" in the patented machine was simply to enable it to accommodate different thicknesses of bound volumes. In other words, that its effect was merely cosmetic. This is completely inconsistent with the operation of the machine taken in the totality of its claims and specifications.

I concur in the majority's opinion to the extent that it disapproves the award of damages for loss sales of unpatented consumable supplies as well as its affirmance of the trial court's denial of treble damages and attorneys fees but I would reverse the finding of infringement.